MAY HOSIERY MILLS, Inc., et al. v. UNIT-
ED STATES DISTRICT COURT IN AND
FOR DIST. OF MONTANA et al.

No. 6893.

Circuit Court of Appeals, Ninth Circuit.
April 4, 1933.

J. Bruce Kremer, L. P. Sanders, and Alf. C. Kremer, all of Butte, Mont., for appellant May Hosiery Mills, Inc.

J. Bruce Kremer and L. P. Sanders, both of Butte, Mont., in pro. per.

S. V. Stewart and John G. Brown, both of Helena, Mont., for appellants F. & W. Grand Stores, Inc., and Edwin M. Lamb, and for appellants generally in contempt proceedings.

Wellington D. Rankin, U. S. Atty., and Arthur P. Acher, Asst. U. S. Atty., both of Helena, Mont., for appellees.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

SAWTELLE, Circuit Judge.

On March 22, 1932, May Hosiery Mills, Inc., filed a bill in equity in the United States District Court for the District of Montana, praying that an ancillary receiver be appointed for F. & W. Grand 5-10-25 Cent Stores, Inc., the defendant in that action.

J. Bruce Kremer, L. P. Sanders, and Alf. C. Kremer appeared as solicitors for the complainant.

The bill set forth, inter alia, that the complainant was a creditor of the defendant in the sum of $3,482.89; that payment of this amount had been duly demanded and had been refused; upon information and belief, that the complainant had brought a suit in the United States District Court for the Southern District of New York against the same defendant; upon information and belief, that upon the filing of the bill in New York and upon the filing by the defendant of an answer admitting the allegations therein contained, an order was made in the New York federal court on March 19, 1932, appointing the Irving Trust Company and Harold L. Green receivers of the defendant's properties; and that it was necessary that an ancillary receiver or receivers be appointed in the district of Montana.

The complainant set forth that it was filing the bill on behalf of itself and all other creditors who would come in and contribute to the expenses of the suit.

The bill further alleged that the complain-

ant had no adequate remedy at law, and prayed for the appointment of an ancillary receiver or receivers for the defendant's property. There was also a prayer that the court enjoin all creditors, stockholders, and other persons from instituting or prosecuting any suits against the defendant or levying against its property, but that all creditors and other "persons interested in the defendant" be permitted to intervene in the Montana suit "if and as permitted and authorized so to do by this Court."

Attached to the bill and made part thereof were a copy of the bill filed in the United States District Court in New York, a schedule of the defendant's properties, a copy of the answer, admitting the allegations of the bill, filed by the defendant in the New York court, and a copy of the New York court's order appointing receivers.

In addition to the allegations contained in the bill filed in the Montana court, the bill filed in the New York court alleged, on information and belief, that notes payable of the defendant amounting to $1,975,000 had become due and payable on March 15, 1932; that there were numerous other creditors, representing an aggregate indebtedness of more than $500,000; that the defendant's properties consisted in large part of assets that "can only be realized upon gradually in the regular course of its business"; that the "defendant, although having properties and assets which, at a fair valuation, exceeded defendant's liabilities, has not on hand sufficient moneys with which to pay its maturing obligations, nor is it able to obtain sufficient moneys to enable it to meet said obligations as the same mature"; that the defendant "conducts a cash retail business"; that its cash on hand in stores "is sufficient only for the day to day operations of such stores"; that "its cash in banks does not exceed $450,000 and defendant's presently realizable quick assets, exclusive of cash and merchandise, do not exceed $175,000"; that certain other of the defendant's creditors "are pressing, or are about to press, their claims for payment, and complainant apprehends that if such claims be not paid the holders thereof may forthwith bring suit * * * and attach the property of the defendant," etc.; that such action on the part of the creditors will, in the complainant's belief, result in judgments, etc., "with the necessary consequence that the defendant will be compelled to cease the conduct of its business"; that such action on the part of any creditors "will interfere with and obstruct such business

* * * and will cause great and irreparable injury and loss to the complainant and other creditors"; and that an attempt by the complainant to enforce at law its claim as a general creditor "might precipitate general action on the part of the other creditors of the defendant, and this in turn would lead to wasteful strife and controversy, which complainant believes could be avoided * * * only through intervention of this Court, including the appointment of receivers."

An answer to the Montana bill was filed on March 22, 1932, admitting the allegations of the bill and joining in the prayer for the appointment of a receiver, etc. Edwin M. Lamb appeared as solicitor for the defendant.

Immediately after the complaint and answer had been filed, they were presented to Judge George M. Bourquin of the United States District Court of Montana, in his chambers. A proposed order appointing ancillary receivers was also presented to Judge Bourquin.

On March 23, 1932, Judge Bourquin denied the application for ancillary receivership, saying: "The suit is friendly, without real controversy, strategic, fictitious, presumptuous to put it mildly, and of the too common—yes, in plain English, collusion, if not conspiracy between embarrassed corporations and amiable courts to hinder and delay the former's creditors, quasi a crime."

On March 25, 1932, the District Judge ordered that parties and counsel in the Montana suit show cause, on April 11, 1932, why they should not be punished for contempt, saying: "So transparent is the attempt to employ this court of justice to work injustice, in a collusive and fictitious proceeding to issue orders prima facie valid but void, an abuse of receivership and injunction to intimidate and injure parties—creditors not before the court, that it is highly reprehensible and in contempt of the court within the Rule of Lord's Case, 8 How. 251 [12 L. Ed. 1067], and Cleveland's Case, 1 Black 419, [17 L. Ed. 93], and cannot be ignored."

On April 11, 1932, a hearing was held, at which the respondents to the contempt citation, including the appellants herein, presented their verified returns and answers, and offered in evidence exemplified copies of the pleadings, orders, and proceedings had in the court of primary jurisdiction, and certified copies of orders appointing a receiver or receivers in ancillary proceedings based upon bills of complaint and answers identical with the pleadings filed in the instant case, the orders being substantially the same as the pro-

posed order submitted to the court below on March 22, 1932.

The orders referred to above were made in various United States District Courts throughout the country, and were dated March 21, 22, or 23, 1932. According to the transcript, twenty-nine federal judges signed such orders, including Judge A. F. St. Sure, of the Northern District of California, and Judge Jeremiah Neterer of the Western District of Washington, both in this circuit.

In their answers all the respondents disclaimed and denied any intentional or unlawful act in contempt of court. Affidavits and other exhibits accompanied some of the answers and returns.

Among the exhibits attached to the affidavit of L. P. Sanders, one of the solicitors for May Hosiery Mills, Inc., and himself one of the appellants herein, were the following pertinent documents:

1. A letter, dated at New York City March 17, 1932, signed jointly by Wickes & Nielson, attorneys for May Hosiery Mills, Inc., and by Nathan Burkan, attorney for F. & W. Grand 5-10-25 Cent Stores, Inc., and addressed to Kremer, Sanders & Kremer, attorneys, of Butte, Mont. This letter contained a statement regarding the financial situation of the hosiery company, asserting that it was unable to meet its maturing indebtedness and that its credit was impaired. The letter inclosed, among other papers, an ancillary bill of complaint, and requested the Butte attorneys to verify and file the complaint in their district. The Montana attorneys were also authorized by the defendant below, the Grand Stores, to select an attorney in their district, who was thereby "authorized to appear and file on its behalf the enclosed answer." The letter also announced that it was the intention to file a bill for a primary receiver in the New York federal court on March 19, 1932.

2. A telegram, dated March 19, 1932, from the New York attorneys, stating that the primary receivers had been appointed in New York, and authorizing the Montana attorneys for the complainant and the defendant to file the bill and the answer, respectively, theretofore sent to Kremer, Sanders & Kremer.

3. A telegram, dated March 21, 1932, from the New York attorneys to the solicitors for the complainant below, reporting that the order appointing the receivers had been signed by Judge Wm. Bondy, of the United States District Court for the Southern District of New York.

4. A telegram, dated March 22, 1932, from the New York attorneys to Kremer, Sanders & Kremer, announcing that out of 32 ancillary receiverships granted on that date throughout the country, the New York attorneys had "secured the appointment of the Irving Trust [Company] and/or Green in 28 instances."

On the presentation of the returns, Judge Bourquin appointed Wellington D. Rankin, the United States District Attorney for Montana, to act as amicus curiæ in the proceedings.

At the hearing to show cause, three of the four attorneys cited for contempt took the stand, and repeated their disclaimer of any wrongful intent in filing the papers. They also recited in some detail the history of the events leading to their respective connections with the Montana proceedings.

The respondents were given ten days in which to file a brief, and the matter was submitted.

On May 16, 1932, Judge Bourquin handed down a decision adjudging all the respondents, except Alf. C. Kremer, in contempt, and ordered that "they be fined in sum $500, of which counsel are holden for $50." (D. C.) 59 F. (2d) 218, 223.

On May 18, 1932, there was entered in the Montana court a decree dismissing the suit for the appointment of receivers, and adjudging the respondents, except Alf. C. Kremer, in contempt, and fining them, as above set forth. The decree recited that counsel should be "jointly and severally holden for fifty dollars."

From that decision and that decree this appeal is prosecuted.

■ As the appellees point out, the propriety of the court's order denying the application for a receiver in equity has become a moot question, since it appears from the appellant's brief that on August 5, 1932, F. & W. Grand 5-10-25 Cent Stores, Inc., was adjudged a bankrupt by the United States District Court for the Southern District of New York. Accordingly, we will not consider that question; for it is fundamental that the jurisdiction of the bankruptcy court is, in the language of the books, "paramount."

In the words of Judge Woolley in the case of Pearse v. United States (C. C. A. 3) 59 F. (2d) 518, 519, "We shall do nothing more than determine just what happened and decide the single question whether, as a fact, contempt of court had been committed."

In the instant case, however, the facts are

undisputed, and only the interpretation of those facts is in question.

The appellees earnestly argue that "the commission of a contempt is determined not by the intent of the parties but by the act done." Where the act done is wrongful or unlawful per se, this is unquestionably true; but where the act is, at worst, of only "doubtful propriety," the question of intent becomes crucial.

As was said by the late Judge Dietrich, of this court, in Caldwell v. United States, 28 F.(2d) 684: "Thus suddenly to punish for conduct of doubtful propriety only, where the intent to be insubordinate is not clear, might very well have the result of deterring an attorney of less courage and experience from doing his full duty to his client."

Again, this court, in the case of Tjosevig v. United States, 255 F. 5, 8, cited by the appellees themselves, recognized the importance of intent where the alleged act was not wrongful or unlawful per se. There it was contended that the filing of an affidavit alleging prejudice or bias of a judge of itself constituted contempt. Of that contention this court said: "If there is anything in the record which tends to support a finding of improper intent, it is the fact that the allegation in the affidavit that Donohoe 'by reason of such friendship and such political services * * * for and on behalf of this honorable judge claims and intends to thereby influence the decision of the court in this case in his favor' is unsupported by any evidence that Donohoe had made such a claim or had expressed such an intention. While the writer of this opinion is inclined to the view that this absence of evidence of Donohoe's actual claim or intention is sufficient to sustain a finding that the affidavit was contemptuous, for the reason that the natural effect of such a charge might be to prejudice the judge against Donohoe, the other party to the suit, who was alleged to claim and intend to influence the judge in his favor as the reward of friendship and political services, and thus obstruct the administration of justice in the case so pending, the majority of the court think otherwise, and are of the opinion that that portion of the affidavit was but the expression of the apprehension and suspicion in the mind of the affiant, because of information which he said had been carried to him, and which he detailed, and that the honesty of the affiant is shown by his further statement that he disavows any intention to reflect upon the honor or integrity of the judge, but 'owing to the circumstances above set forth he feels that he is at a disadvantage in submitting the issues of fact in this case to the decision of said honorable judge,' and that the embarrassment which he felt was only such as most laymen would feel under similar circumstances."

There was no dissent filed in the Tjosevig Case.

Similarly, the Circuit Court of Appeals for the Eighth Circuit has recognized the possible materiality of intent in such cases, in Conley v. United States, 59 F.(2d) 929, 935: "Defendant Conley contends that his return and general denial under oath purged him of the charges preferred in the information, and that the case against him should have been dismissed. This is too broad a statement of the law. That effect of a mere denial under oath may result only when the contempt inheres in the intent with which an ambiguous act is done. Bowles v. United States (C. C. A. 4) 50 F.(2d) 848."

In the foregoing discussion we have assumed, for the sake of the argument only, the most favorable hypothesis that, under the facts at bar, could be maintained on behalf of the appellees; namely, that the bringing of the suit for the appointment of an ancillary receiver was an "ambiguous" act, "of doubtful propriety." We desire to emphasize, however, that, so far as contempt is concerned, the Montana suit is, as we shall see, not only not "doubtful," but it is unquestionable. Under facts more or less similar to those at bar, some courts have, and some courts have not, authorized primary or ancillary receiverships; but we have been directed to no case, nor have we been able to discover any, where all or any of the parties concerned and their counsel have been punished for contempt because they mistakenly invoked the jurisdiction of a federal court for such a purpose.

We regard it as a somewhat novel proposition of law that parties and their counsel who, though misconceiving their legal remedies, lay, as here, all the facts fully and frankly before the court, should be adjudged in contempt merely because they "guessed wrong." We do not conceive that in such a case, punishment of the parties or of their counsel tends to vindicate the dignity of the court.

We advert, then, to the ultimate question involved in this case; namely, Is the bringing of such a suit wrongful or unlawful per se?

In re Metropolitan Railway Receivership,

208 U. S. 90, 110, 111, 28 S. Ct. 219, 224, 52 L. Ed. 403, the leading case on the subject, the court said: "In this case we can find no evidence of collusion, and the circuit court found there was none. It does appear that the parties to the suit desired that the administration of the railway affairs should be taken in hand by the circuit court of the United States, and to that end, when the suit was brought, the defendant admitted the averments in the bill, and united in the request for the appointment of receivers. This fact is stated by the circuit judge; but there is no claim made that the averments in the bill were untrue, or that the debts named in the bill as owing to the complainants did not in fact exist; nor is there any question made as to the citizenship of the complainants, and there is not the slightest evidence of any fraud practiced for the purpose of thereby creating a case to give jurisdiction to the Federal court. That the parties referred to take the subject-matter of the litigation into the Federal courts, instead of proceeding in one of the courts of the state, is not wrongful. So long as no improper act was done by which the jurisdiction of the Federal court attached, the motive for bringing the suit there is unimportant. [Several cases cited.]"

Co-operation between the parties to bring a case into the federal court is not objectionable. In Black & White Taxicab & Transfer Co. v. B. & Y. Taxicab & Transfer Co., 276 U. S. 518, 525, 48 S. Ct. 404, 405, 72 L. Ed. 681, 57 A. L. R. 426, the court used the following language: "The motives which induced the creation of respondent to become successor to its Kentucky grantor and take a transfer of its property have no influence on the validity of the transactions which are the subject of the suit. The succession and transfer were actual, not feigned or merely colorable. In these circumstances, courts will not inquire into motives when deciding concerning their jurisdiction. McDonald v. Smalley et al., 1 Pet. 620, 624, 7 L. Ed. 287. It is enough that respondent is the real party in interest. Smith et al. v. Kernochen, 7 How. 198, 216, 12 L. Ed. 666. The incorporation of respondent or its title to the business and contract in question is not impeached. Co-operation between it and the railroad company to have the rights of the parties determined by a federal court was not improper or collusive within the meaning of section 37 [of the Judicial Code, 28 USCA § 80]. [Cases cited.]"

Indeed, the Supreme Court has gone so far as to say that a judgment may be "collu-sive" in a limited sense without being collusive in a legal sense. In Dickerman v. Northern Trust Company, 176 U. S. 181, 189, 190, 20 S. Ct. 311, 314, 44 L. Ed. 423, quoted in part by the appellees themselves, we find that the complete discussion by the court on the subject is adverse to the appellees' present contention: "We have no doubt that this judgment was collusive in the sense that it was obtained by the plaintiff and consented to by the defendant company for the purpose of giving the trustees a legal excuse for declaring the principal and interest of the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioners' case. Collusion is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law,' and in similar terms by other legal dictionarians. It implies the existence of fraud of some kind, the employment of fraudulent means or of lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law and with a due regard to the rights of parties, it is no defense that the plaintiff may have had some ulterior object in view beyond the recovery of a judgment, so long as such object was not an unlawful one."

Summarizing their view of the facts in this case, the appellees say in one portion of their brief: "In conclusion, from a review of the undisputed facts in this case, it is apparent that the sole purpose of the action in Montana was for the appointment of a receiver. May Hosiery Mills, Inc., did not participate in such a widespread proceeding conducted as near simultaneously as possible in thirty or more courts, as a part of a plan to recover $3,482.89 due from F. & W. Grand 5-10-25 Cent Stores, Inc. That this was the purpose is not even contended by the appellants."

According to this statement of the appellees, then, the "ulterior object" of the Montana suit was the appointment of a receiver by the federal court. There is nothing "unlawful" about such an object. The existence of a bona fide debt is undisputed; so is the diversity of citizenship; so is the statutory amount of the debt. None of these elements was either feigned or created simply for the purpose of the suit. There is nothing unlawful or contemptuous in co-operation in submitting genuine private difficulties to the ar-

bitrament of a federal court. If, after an inspection of the pleadings and a hearing of the evidence, the court decides that there is no reason for a receivership, the remedy is to dismiss the suit, but not to punish the parties for having mistaken their remedy.

Elsewhere in their brief, however, the appellees stress "collusion" as vitiating the appellants' efforts for the appointment of receivers, and add that "such a proceeding is an abuse which may be treated as a punishable contempt."

Continuing, therefore, our inquiry into the effect of consent in a case of this character, we find ample authority to sustain an action for the appointment of a receiver under similar circumstances. The first paragraph of the opinion by Judge Knappen in American Brake Shoe & Foundry Co. v. Pere Marquette R. Co. (C. C. A. 6) 205 F. 14, 18, certiorari denied, 229 U. S. 624, 33 S. Ct. 1051, 57 L. Ed. 1356, is particularly in point: "1. The bill in the suit in which the receivers were appointed and the order in question made was filed by a single creditor, who had no judgment and claimed no lien, and who thus had no standing (except by consent of the defendant) to seize the latter's property and apply it to the satisfaction of complainant's claim. None of those representing the mortgage interests were made parties. The suit is criticised as in effect that of the railroad company and for the benefit of its stockholding interests. But the objection that the bill was filed by a single unsecured creditor, without judgment or claim of lien, is waived, and stands as though it had never existed, when the defendant voluntarily appears, confesses the debt, admits its insolvency, and joins in the prayer for receivership. Such objection cannot, therefore, be raised by other creditors, who were not parties to the suit as brought; and the case will not be regarded as collusive merely because the parties to the suit acted in accord and arranged together that the suit should be brought in a given court, and that the averments of the bill should be admitted by the answer. In re Metropolitan Railway Receivership, 208 U. S. 90, 110, 28 S. Ct. 219, 52 L. Ed. 403; Horn v. Pere Marquette R. R. Co. (C. C.) 151 F. 626, 633. We have no doubt of the court's jurisdiction to entertain the creditors' suit and to appoint receivers therein."

While in the above case insolvency was alleged and admitted, that point of difference from the case at bar does not detract from the pertinence of Judge Knappen's remarks on the question of collusion.

See, also, South Dakota v. North Carolina, 192 U. S. 286, 310–312, 24 S. Ct. 269, 48 L. Ed. 448; Blair v. Chicago, 201 U. S. 400, 448, 449, 26 S. Ct. 427, 50 L. Ed. 801; Harris v. Brown (D. C.) 6 F.(2d) 922, 925, 926; Kingsport Press v. Brief English Systems (C. C. A. 2) 54 F.(2d) 497, 500, 501, certiorari denied, Owen v. Kingsport Press, 286 U. S. 545, 52 S. Ct. 497, 76 L. Ed. 1282; Ex parte Relmar Holding Co., Inc., etc. (C. C. A. 2) 61 F.(2d) 941, 942.

Conservation receiverships have repeatedly been approved of by federal courts. In Luhrig Collieries Co. v. Interstate Coal & Dock Co. (D. C.) 281 F. 265, 269, affirmed (C. C. A. 2) 287 F. 711, certiorari denied 262 U. S. 751, 43 S. Ct. 700, 67 L. Ed. 1215. Judge Learned Hand said: "But if it appears that the assets of every kind are not enough to pay all creditors, if left to a general welter of attachments, executions, and separate creditors' bills, a different situation is presented. The corporation may well be solvent if its assets be nursed along, and insolvent if they be thrown to the creditors for piecemeal sale. Recognizing in such event that creditors' bills will in the end be necessary, though unsuccessful, equity will anticipate them by presently stepping in, in the interest of securing the greatest possible payment ratably for all creditors, since the protection of creditors is an interest of equity as well as law."

See, also, Metropolitan Railway Case, supra, at page 112 of 208 U. S., 28 S. Ct. 219, 52 L. Ed. 403; Grasclli Chemical Co. v. Ætna Explosives Co., Inc. (C. C. A. 2) 252 F. 456, 460; Durand & Co. v. Howard & Co. (C. C. A. 2) 216 F. 585, 587, 588, L. R. A. 1915B, 998; In re Consolidated Distributors, Inc. (C. C. A. 2) 298 F. 859, 865.

No evidence was introduced by the appellees in the contempt hearing. Judge Bourquin, in the following manner, reached his conclusion that there was contempt: "After due consideration, taking the pleadings by four corners, *looking through forms to discover intent*, assuming at least the perspicacity of the average man, ignoring conclusions, giving due weight to facts, having in mind the principles of pleading and equity and the federal statute (Judicial Code § 37 [28 US CA § 80]), it is clear that the proceedings are collusive, sham, fictitious, in bad faith, of ulterior motive, for the benefit of defendant alone," etc. (Italics our own.)

The lower court's observations as to intent are particularly interesting, in view of the earnest argument, above referred to, made

in the brief of the amicus curiæ, to the effect that "the commission of a contempt is determined not by the intent of the parties but by the act done."

Fraud is never presumed. It must be proved, either directly, by affirmative evidence, or indirectly, by inferences deducible from established facts. We fail to find in the record either type of proof that fraud was being attempted upon the court by counsel or parties. The full disclosure of the facts and of the litigants' plans negatives such presumption. Apposite in this connection are the words of Mr. Justice Cardozo, in Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 144, 77 L. Ed. ——, decided December 5, 1932, and cited by the appellees themselves. In that case a corporation was "created three days before the suit for the very purpose of being sued," and "was to be interposed between its author and the creditors pursuing him, with a restraining order of the court to give check to the pursuers." A conveyance to the corporation was found to be "voidable because fraudulent in law," and it was held that "the receivership must share its fate." Yet even under those strong facts there was no suggestion of punishment for contempt, Mr. Justice Cardozo saying: "We have no thought in so holding to impute to counsel for the debtor or even to his client a willingness to participate in conduct known to be fraudulent. The candor with which the plan has been unfolded goes far to satisfy us, without more, that they acted in the genuine belief that what they planned was fair and lawful. Genuine the belief was, but mistaken it was also. Conduct and purpose have a quality imprinted on them by the law."

In that case the only result of the "quality imprinted" on "conduct and purpose" was that the receivership was condemned, but not the parties or their counsel.

Furthermore, the likelihood that an attempt was being made to perpetrate a fraud upon the Montana court is considerably lessened by the fact that, on the day the papers were presented to Judge Bourquin, a primary receivership had been ordered by the New York court, and twenty-eight ancillary receiverships had been ordered by federal courts throughout the country. As was said by Mr. Justice Day in Great Western Mining & Mfg. Co. v. Harris, 198 U. S. 561, 577, 25 S. Ct. 770, 775, 49 L. Ed. 1163, "It is true that the ancillary receiverships are generally conducted in harmony with the court of original jurisdiction. * * *"

The cases relied upon in the opinion of

the judge below do not sustain his main position. In Harkin v. Brundage, 276 U. S. 36, 56, 48 S. Ct. 268, 275, 72 L. Ed. 457, the court held that "what was done here in delaying the state court and inducing the federal court to act without a full disclosure of what had been done in the state court," was a fraud upon both courts. In that case it appears that there was an intentional failure to disclose to the court matters known to the parties and clearly relevant.

Hardy v. North Butte Mining Co. (D. C.) 20 F.(2d) 967, another receivership case, was reversed by this court, in 22 F.(2d) 62, as the lower court itself pointed out. Great Falls Gas Co. v. Public Service Commission of Montana (D. C.) 39 F.(2d) 176, cited in another connection, deals with neither contempt nor receivership, and is therefore not in point. Neither are Central Union Trust Co. of New York v. North Butte Mining Co. (D. C.) 26 F.(2d) 675, Link Belt Machinery Co. v. Hughes, 195 Ill. 413, 63 N. E. 186, 59 L. R. A. 673, and Prudential Securities Co. v. Three Forks, etc., Co., 49 Mont. 567, 144 P. 158.

The two cases chiefly relied upon by Judge Bourquin, as "like in principle," are Lord v. Veazie, 8 How. (49 U. S.) 251, 12 L. Ed. 1067, and Cleveland v. Chamberlain, 1 Black (66 U. S.) 419, 17 L. Ed. 93. Both are "distinguishable on the facts," as Judge Bourquin himself concedes, and therefore need not be more fully considered here.

United States v. Frank et al. (D. C.) 53 F.(2d) 128, another contempt case, was reversed in Pearse v. United States, supra, by the Third Circuit Court of Appeals, on June 1, 1932.

Indeed, Judge Bourquin concedes that "it may be true that, on the rare occasions when they failed, like sham and collusive suits have been merely dismissed and no penalty as for contempt imposed." But he adds, "The more reason for a precedent." We cannot concur in this view.

The additional cases cited by the appellees are either not in point or not controlling upon this court.

Accordingly, the judgment for contempt is reversed. Since, however, as before pointed out, the question of the appointment of a receiver in equity has been made moot by the subsequent proceedings in bankruptcy, the mandate will not include reference to the receivership, but will be confined to the judgment for contempt.

Judgment reversed.