[No. 30626.   Department Two.   February 7, 1949.]

ARTHUR ERNEST GUINNESS, *Respondent and Cross-appellant,*
v. KING COUNTY *et al., Appellants.*[1]

[1]Reported in 202 P. (2d) 737.

*Lloyd Shorett* and *Milton Heiman,* for appellants.

*Merritt, Summers & Bucey, G. H. Bucey,* and *Charles B. Howard,* for respondent and cross-appellant.

SCHWELLENBACH, J.—This is an appeal from a decree holding that a pleasure yacht was exempt from taxation for the years 1940 to 1945, inclusive, and a cross-appeal from the decree holding that it was subject to tax for the year 1946.

Arthur Ernest Guinness is a subject of Great Britain, with his domicile in London, England. On September 3, 1937, he purchased the yacht "Fantome." This vessel was used solely for pleasure cruising and has never been used for any other purpose. It is registered under the laws of Great Britain, with the home port in Southampton, England.

In February, 1939, the yacht left England for a cruise in the north Pacific waters. Mr. Guinness and his guests flew from London and met it upon its arrival in San Franscisco, in July. They proceeded up to Seattle and thence to Victoria and Vancouver, B. C. From there they cruised up the coast to Alaska and back to Vancouver. They then

came back to Seattle in the latter part of July, where they moored in Union Bay in the Seattle harbor.

Mr. Guinness then returned to London, planning to come back the following February for a cruise to the Hawaiian Islands. He permitted half of the crew of thirty-four (all British subjects) to take a vacation, the plan being for the remaining half to take a vacation upon their return.

In September, 1939, war was declared between Great Britain and Germany. Great Britain enacted emergency war legislation, the effect of which conscripted all man power under a certain age; prevented the removal of all vessels under British Registry, wherever situated, without special permission; and "froze" all of the assets, wherever located, of British citizens.

As a result of the regulations adopted under this legislation, all but three members of the crew (who were over age) were conscripted for war work. No funds were available to hire another crew, or to move the vessel. Mr. Guinness succeeded in having three thousand dollars released for maintenance, and, at one time, five thousand dollars for repairs. Because of this, the vessel has been moored in the Seattle harbor from July, 1939, to the present time.

In 1946, the assessor of King county assessed the "Fantome" at $200,000, and the treasurer made the following levy for taxes:

| | |
|---|---|
| 1940 | $2,385.60 |
| 1941 | 2,460.00 |
| 1942 | 2,546.40 |
| 1943 | 2,360.00 |
| 1944 | 2,356.80 |
| 1945 | 2,524.00 |
| 1946 | 2,324.00 |
| Total | $16,956.80 |

Plaintiff commenced this action to restrain the collection of the tax. The trial court decreed as above stated, and this appeal follows.

Error is assigned in the refusal of the trial court to allow the assessment against the "Fantome" for the years 1940 to 1945, inclusive; in failing to find its situs in King county during those years; in allowing and considering testimony concerning the laws of Great Britain; and in refusing to grant appellants' motion for dismissal upon the challenge to the legal sufficiency of the evidence.

The general rule is that a ship or vessel can be taxed only at her legal situs—her home port and the domicile of her owner—and is not taxable by a state, other than that in which her owner resides, to which she plies, and at which she is temporarily staying while loading or unloading her cargo. However, when a vessel is kept and used wholly within the limits of a state other than that in which the owner resides, she acquires a situs in such state for the purpose of taxation, even though she is engaged in interstate commerce. 51 Am. Jur. 808, Taxation, § 913.

The term "commerce" is the equivalent of the phrase "intercourse for the purpose of trade" and comprises every species of commercial intercourse. It includes the purchase, sale, and exchange of commodities, and the transportation of persons and property by land, water, and air. 11 Am. Jur. 7, Commerce, § 3.

A yacht used exclusively for pleasure cruising is not engaged in commerce. However, in order to determine its situs for the purpose of taxation, the same test is used as that used in determining the situs of vessels engaged in commerce. *Barker v. Inhabitants of Fairhaven*, 265 Mass. 333, 163 N. E. 901; *Bush v. State ex rel. Dade County*, 140 Fla. 277, 191 So. 515.

In order to give a state jurisdiction over a vessel for the purpose of taxation, it must become incorporated into the personal property of that state, rather than being there temporarily only. *Morgan v. Parham*, 83 U. S. 471, 21 L. Ed. 303.

The rule is stated in 51 Am. Jur. 468, Taxation, § 453, as follows:

"Before tangible personal property may be taxed in a state other than the domicil of the owner, it must have acquired a more or less permanent location in that state, and not merely a transient or temporary one. Generally, chattels merely temporarily or transiently within the limits of a state are not subject to its property taxes. Tangible personal property passing through or in the state for temporary purposes only, if it belongs to a nonresident, is not subject to taxation under a statute providing that all real and personal property in the state shall be assessed and taxed. The state of origin remains the permanent situs of property for the purpose of taxation, notwithstanding the occasional excursion of the property to foreign parts. But property sent into a state by a nonresident, to be used or employed permanently there, must bear its fair share of the burden of taxation, although no one unit of such property is ever more than temporarily located within the taxing state. A criterion is whether the property is there for an indefinite time or some considerable definite time, and whether it is used or exists there to be used in much the same manner as other property is used in that community."

In *North American Dredging Co. v. Taylor*, 56 Wash. 565, 106 Pac. 162, 29 L. R. A. (N.S.) 105, we said:

"There must be some reasonable limit to the rule that overcomes the ordinary rule of situs when applied to such property, and we think it must be found in the answer to the question whether the presence in Pierce county of the dredger was temporary or merely indefinite. If the former, it would probably not be taxable. If the latter, it would be, so long as it was there at a time when the levy was made and the lien attached. Otherwise the property might remain an indefinite time running over the period of a dozen contracts, or so long as it found profitable employment, and yet be exempt from taxation, although during the whole time the property would receive the protection of the local laws. If the intention merely were allowed to control, we opine that property of this character would never be taxed, unless the conscience of the owner moved him to list it at the home port or at his domicile, which under the facts of this case he would not be bound to do."

Was the stay of this yacht temporary or had it acquired a more or less permanent location? In determining this question, we must consider all of the facts surrounding its stay, and from those facts, learn, if we can, the inten-

tion of the owner. There is no doubt but that, during all of these years, the vessel received the same protection from King county as did any other vessels moored in the harbor during that time.

When the respondent and his party returned from their cruise in Alaskan waters in July, 1939, they intended to resume their cruise to Hawaii the following February. Had that been done, their stay would have been temporary. When did it lose its temporary characteristic? There is no question but that a stay from July, 1939, to the present time cannot be termed temporary.

Most of the cases changing the situs of vessels are based upon some action of the owners themselves, as, for example, where they maintained the property in a certain locality to suit their own convenience, or for protracted local use. It was held in *Yost v. Lake Erie Transp. Co.*, 112 Fed. 746, that vessels laid up in Toledo harbor when, because of the rigors of the season, navigation was closed, did not thereby change their situs to that port. Of course, a vessel cannot lie idly by at some port for an indefinite time and receive the protection and benefits afforded by the taxing officials of that port, without its situs being changed.

Up until the close of hostilities in 1945, the yacht was "frozen" in the Seattle harbor. It was frozen just as effectively as those vessels were frozen in the Toledo harbor. The owner was prohibited by British law from moving her; all but three of his crew were drafted into the war effort; all of his funds, with the exception of a small amount for maintenance, were "frozen" by the British government. True, he could have applied to the British Registry for permission to remove the vessel to Vancouver, but that permission would have been denied, because of the danger involved, and because it would require man power and money which were needed in the war effort. Respondent did not do anything, by affirmative action, to prolong the stay of the yacht. Nor was its stay prolonged because he sat idly by and refused to do anything. Any attempt on his part to change its location would have been futile. Under the circumstances of this case, we find that the stay

of the yacht "Fantome" in the Seattle harbor, for the years 1940 to 1945, inclusive, was temporary.

■ Appellants contend that the trial court erred in receiving testimony concerning the laws of Great Britain. Respondent was entitled to show why he could not move the yacht, and the court was not only entitled, but required, to consider that testimony in deciding whether or not the situs had been changed.

■ Respondent cross-appeals from that portion of the decree which sustained the taxes assessed on the "Fantome" for the year 1946, contending that the court erred in finding that the vessel had acquired a situs in King county on January 1, 1946. He summarizes the findings of the trial court (to which he excepts) as follows:

"(1) That on January 1, 1946, the vessel was no longer present for the purpose of the originally intended cruise, which had been permanently postponed and abandoned; and that no voyage from the state then was contemplated.

"(2) That the general disrepair of the vessel, her lack of adequate crew, and inability to procure funds, made her no longer capable of actual navigation, and rendered her an 'abandoned' vessel.

"(3) That the British restrictions on the use of funds after August 14, 1945, were not in the nature of wartime restrictions."

There is a dispute in the testimony. However, there is ample evidence in the record to sustain the findings of the trial court, and they will not be disturbed on appeal. After the cessation of hostilities, the danger of travel was eliminated, as was also the condition whereby a crew could not be obtained. Although some of the restrictions on the use of funds were continued, we are satisfied, from the record, that Mr. Guinness could have obtained sufficient funds to remove the vessel from Seattle harbor had he so desired.

In *Bush v. State, supra,* the yacht "Coronet" (whose home port was New York City), a vessel used solely for the pleasure of its owners (residents of the state of New York), remained in Dade county, Florida, in the Miami harbor, continuously for seven years. The taxing authorities contended that the vessel had acquired an actual situs in Dade

county for taxing purposes. The owners contended that her stay in Miami was temporary and casual, but that their finances became so involved as to make the operation of the yacht for the time being impracticable. It was held that the vessel acquired an actual situs in Dade county, and was liable to personal property tax in that county. The court said:

" 'Counsel for the yacht owners argue that this case is controlled by *Yost v. Lake Erie Transportation Co., supra,* because in the Yost case the vessels were tied up at Toledo during the winter because of the frozen condition of Lake Erie. Counsel then contends that, in the instant case, the freezing of the owner's finances should be held to have a like effect. In the Yost case, the vessels remained in the Port of Toledo because of freezing weather and did not thus lose their status as being actually engaged in commerce or in transit. So, he contends in the instant case, the yacht Coronet should not lose her status as being actually engaged in commerce or in transit because she was compelled to remain in the port of Miami because of frozen finances. This position is not sound because the liability of the vessel for taxation cannot depend upon the condition of the owner's finances.' "

In 1946 the "Fantome" was assessed by the taxing authorities of King county. The owner was advised of this fact. However, he did nothing. He sat idly by and permitted the vessel to receive the protection and benefits afforded by the taxing officials. It thereby became incorporated into the personal property of King county, its stay having lost its temporary characteristics.

Respondent contends that a tax by King county would be an infringement on, and an interference with, commerce. However, we have pointed out that this vessel was not engaged in commerce, but was used solely for pleasure cruising.

The judgment is affirmed.

ROBINSON, SIMPSON, and MALLERY, JJ., concur.

HILL, J. (concurring in the result)—I concur in the result. I disagree with the statement that there was evidence to support the trial court's finding that the "Fantome" was an "abandoned" vessel.