CUASCUT et al. v. STANDARD DREDG-
ING CORP.

NEGRIN et al. v. STANDARD DREDG-
ING CORP.

Civ. Nos. 3939, 3894.

United States District Court
D. Puerto Rico.   San Juan Division.

Dec. 5, 1950.

Santiago De La Fuente and Hipolito Marcano, San Juan, Puerto Rico, for plaintiff.

Brown, Newsom & Cordova, San Juan, Puerto Rico, for defendant.

ROBERTS, District Judge.

These are actions for the recovery of unpaid wages brought under section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b). The plaintiffs were variously employed by the defendant in the course of certain dredging operations it performed in Puerto Rico during the period from September of 1939 to November of 1943. These dredging operations comprised six separate projects, five in San Juan Bay and one in Arecibo harbor. The cases were tried originally by Judge David Chavez, Jr., and a decision was rendered by him on April 26th, 1950. Thereafter the plaintiffs and the defendant each petitioned for rehearing, which petitions were granted and rehearing held.

The dredging operations under consideration may be described generally as follows, the alphabetical designation being that used by the trial judge in his findings of fact. Project (a), the deepening and widening of the entrance channel to and the turning basin in San Juan harbor; project (b), the dredging of material from the waters of San Antonio channel immediately north of Isla Grande and from waters of the bay immediately south of Isla Grande, an area referred to in the record as the "Southern Borrow Pit Area", for deposit on Isla Grande as a preparatory step in the construction of an air base thereon for the United States Navy; project (c), the dredging of an entrance channel and turning basin for the United States Naval Dry Dock at San Juan; project (d), the dredging of an entrance channel and turning basin for the United States Army Terminal at Cataño; project (e), the dredging to deepen and improve Arecibo harbor; and, project (f), the dredging to deepen an area immediately to the west of Pier No. 1 on the San Juan waterfront.

After trial in the matter the trial judge concluded that the dredging done under project (a) in deepening and widening the entrance channel and turning basin at San Juan harbor; under that phase of project (b) which involved dredging material from the waters of San Antonio channel for deposit on Isla Grande; under project (c) in dredging the entrance channel and turning basin for the Navy Dry Dock; and, under project (f) in deepening an area west of Pier No. 1 on the San Juan waterfront, constituted engagements in commerce and that the plaintiffs who were employed thereon were within the coverage of the Act.

The trial judge further concluded that the dredging performed under that phase of project (b) that involved dredging material from waters immediately south of Isla Grande, the Southern Borrow Pit Area, so-called, for deposit on Isla Grande; under project (d) in the dredging of an entrance channel and turning basin for the Army Terminal at Cataño; and, under project (e) in deepening and improving the harbor at Arecibo, did not constitute engagements in commerce and that the plaintiffs employed thereon were not within the coverage of the Act.

The trial judge also concluded that none of the plaintiffs were seamen within the meaning of section 213 (9) (14) 29 U.S. C.A. which exempts employees employed as seamen from the coverage of the Act.

Thereafter, the defendant petitioned for rehearing, contending that it was error on the part of the trial judge to conclude that the dredging performed under projects (a), (c), (f) and in part under (b) constituted engagements in commerce and that the plaintiffs employed thereon were within the coverage of the Act, and that none of the plaintiffs were seamen within the meaning of the exemption of section 13 (a) (3), in that those plaintiffs who were employed as captains and deckhands

aboard the defendant's launches were seamen within the meaning of the exemption. The defendant also urged, for the first time on rehearing, that those plaintiffs who have been employed as galley help by the defendant aboard its dredges were not engaged in commerce and were not within the coverage of the Act.

The plaintiffs also petitioned for rehearing, contending that the trial judge erred in concluding that the dredging performed under projects (d), (e) and in part under (b) did not constitute engagements in commerce and that the plaintiffs thereon employed were not within the coverage of the Act.

The questions raised on rehearing relate solely to the extent to which the plaintiffs here were engaged in commerce while employed on the dredging operations under consideration, and, therefore, the extent to which said plaintiffs are within the coverage of the Act. In resolving these questions I shall consider first those dredging operations which were performed in San Juan Bay.

■ The trial judge in seeking to determine the coverage of the Act here, did not, in so doing, consider San Juan Bay as a single integrated waterway. Rather, he divided the bay into segments on the basis of the location of each particular dredging operation performed therein, thereupon, determining the character of each such segment as a highway of interstate commerce without reference to its integration into the bay as a whole. This segmentation of the bay for the purpose of establishing its character as a highway of interstate commerce I am constrained to regard as error which had the effect of doing manifest injustice to the plaintiffs.

In Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286, 288, this process of fragmentation was disapproved, the court saying: "If the declared purpose of the Act is to be accomplished, a project should be considered as a whole, in a realistic way; not broken down into its various phases so as to defeat the purpose of the Act. This latter unrealistic approach was condemned by the Supreme Court in Walling

v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460."

■ This reasoning may be appropriately applied in the instant case because of its consistency with an intent to effectuate the purposes of the Act. It was the purpose of the Act to eliminate from interstate commerce the evils attendant upon low wages and long hours of service. Being remedial, and having a humanitarian end in view, the Act is broad and comprehensive and is to be liberally construed with respect to coverage. McComb v. Farmers Reservoir & Irrigation Co., 10 Cir., 167 F.2d 911, 913, and cases cited therein. The breadth of the coverage intended is made clear in Walling v. Jacksonville Paper Co., 564, where the court said, 317 U.S. at page 567, 63 S.Ct. at page 335, 87 L.Ed. 460: "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce."

In the instant case, however, the resort to a segmentation of the bay has resulted in narrow and technical interpretations with respect to the character of the bay as an instrumentality of interstate commerce which, because they effect a restriction of the coverage of the Act, should have been avoided. I am of the opinion that, for the purpose of determining the coverage of the Act with respect to dredge workers, the waterway in which the dredging was performed should be considered as a single integrated waterway and its character as an interstate highway determined on that basis, unless such a concept is clearly unrealistic. In the case of San Juan Bay, the requirement of realism, recognized in the Loftis case, supra, is not met unless the bay is considered as a single integrated waterway. While, technically, each dredging operation may well be considered a separate project, the waterway in which they were performed and on which they had a common effect, and, which is a controlling factor in a determination of the plaintiffs' right to coverage, was not a group of separate waterways, but a single integrated waterway.

There is ample evidence in the record which supports the proposition that San Juan Bay is a single integrated waterway. Included in the record are three marine charts of San Juan Bay, published by the United States Coast & Geodetic Survey, one in October of 1935, one in July of 1940, and one in February of 1942. These charts accurately delineate the geographical extent and the physical characteristics of the bay. They reveal it to be an extensive natural harbor, located on the north coast of Puerto Rico which, during the period covered by these charts, has been substantially improved for navigation. These charts, in my opinion, make it clear that San Juan Bay is a single integrated body of water which, if it is a highway of interstate commerce, can only be considered realistically as a single integrated facility of such commerce.

That San Juan Bay, in its entirety is, and for many years has been, used as a highway of interstate commerce is established by the record. This commerce has been carried by deep draft vessels into and out of such areas of the bay as deep draft vessels have been able to navigate. In the more shallow portions of the bay this commerce has been carried by shallow draft vessels, including schooners, sloops, launches, manually propelled barges and other small craft. It is clearly established that these shallow draft vessels, while so engaged in interstate commerce, utilized artificial and natural channels to make a general penetration into every part of the bay. The record shows that they went far into San Antonio Channel; entered the easterly reaches of the bay to carry interstate cargo to Miraflores and the Martin Pena canal; and similarly carried interstate cargo to several points on the south shore, including Cataño. A close examination of the record reveals nothing that negatives the character of the bay, in its entirety, as a highway of interstate commerce.

■ It is my opinion that, considered in its entirety, San Juan Bay was a highway of interstate commerce during the period when the dredging operations under consideration were being performed and that the employment of the plaintiffs on any of these operations that constituted either the repair, maintenance or improvement of the bay as a facility of such commerce was an engagement in commerce which brought them within the coverage of the Act.

■ The defendant has urged, however, that work on at least three of the projects under consideration was not the repair, maintenance or improvement of a facility of interstate commerce but was, in fact, the construction of new facilities which, although intended for use in commerce, had not yet been utilized in such commerce. Therefore, it contends, the doctrine of new construction as set forth in the case of Raymond v. Chicago, M., & St. P. R. R. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583, should be applied. Under the doctrine of new construction employees employed in original construction are deemed not to be engaged in commerce. In support of its position the defendant cites Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719, and Brue v. J. Rich Steers, Inc., D.C.N.Y., 60 F.Supp. 668.

The gist of the argument thus advanced by the defendant is that the dredging performed under project (b) where material was dredged from the waters of San Antonio channel and waters immediately south of Isla Grande, the Southern Borrow Pit Area, so-called and deposited on Isla Grande constituted the initial step in the construction of new air base facilities on Isla Grande in that it was a necessary preparatory step for construction. Also, that the dredging performed under projects (c) and (d) where channels and turning basins were dredged for the Naval Dry Dock and the Army Terminal, which installations were under construction at the time of the dredging, was the construction of new facilities and not the repair, maintenance or improvement of an existing facility of commerce.

With these contentions I cannot agree. It is my opinion that the rule laid down in Walling v. Patton-Tulley Trans. Co.,

6 Cir., 134 F.2d 945, is controlling in the instant case. In that case the defendant, under contracts with the federal government, was engaged in the repair and construction of dikes and revetments along the Mississippi river. The plaintiffs had been employed by the defendant on such projects. This district court concluded that the plaintiffs while so employed were not engaged in commerce and were not within the coverage of the Act. The circuit court, on appeal, reversed the district court, saying in part, 134 F.2d at page 947: "The District Court sensed a distinction between the present case and those applying the doctrine of the Pedersen case [Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125], based upon the rule of Raymond v. Chicago, M., & St. P. R. R. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583, and cases therein cited, in the fact that the employees of the appellee were engaged in a construction operation rather than in one of maintenance or repair of an interstate facility, since it had been there held that construction of a facility not yet employed in interstate commerce was not an engagement in such commerce. The short answer is that the Mississippi River has been a highway of interstate commerce since states were first carved out of its contributory territory, and so the reasoning that construction upon a highway not yet utilized for interstate commerce is not work in interstate commerce does not apply."

██  In view of the language above quoted, it is clear that the contention of the plaintiff in the instant case is unsound. None of the plaintiffs here were engaged in building either the Naval Dry Dock, the Army Terminal or the air base facilities on Isla Grande. They were engaged wholly in submarine excavation in San Juan Bay and, as a necessary incident to an integrated dredging operation, the deposit of dredged material in appropriate places away from the dredged area. What the plaintiffs actually accomplished in the course of their activities was to deepen, widen and extend channels in the bay, both natural and artificial; to increase the areas of deep water in the bay; to provide for more direct routes between various parts of the bay; to eliminate or minimize obstacles and hazards to navigation; and, to deposit material dredged during these operations in appropriate places designated for such purpose. Such work did not constitute the construction of new facilities but the repair, maintenance and improvement of San Juan Bay as a highway of interstate commerce.

██  The defendant has emphasized that the contracts under which project (b) was performed were not contracts designed to effect the improvement of the bay but were contracts designed to secure "fill" for use on Isla Grande, such "fill" to be dredged from the waters of San Antonio channel and the Southern Borrow Pit Area, so-called, south of the island. Conceding this, the conclusion here reached is not thereby altered. It is well settled that when determining coverage under the Act the work actually performed by the employees is controlling and not the business of the employer. Overstreet v. North Shore Corp., 318 U.S. 125, 132, 63 S.Ct. 494, 87 L.Ed. 656, and cases therein cited. In the instant case, without regard to the nature of the defendant's contracts, the work actually being performed by the employees was dredging that improved an existing highway of interstate commerce.

Neither, with respect to project (b), can I agree with the propriety of the trial judge's division of that project into two phases and holding that work performed under one phase was work in interstate commerce while work performed under the other was not. There is, as the trial judge pointed out in his opinion, a paucity of testimony in the record concerning dredging under project (b) in the Southern Borrow Pit, Area so-called, that is, to the south of Isla Grande. But there is sufficient testimony in the record to establish that the contracts covering project (b) contemplated dredging south of the island and that some such dredging did occur and resulted in the elimination of one shoal and the reduction of another, and that material so dredged was deposited on Isla

Grande. Because of this and the language of the Loftis case, supra, I conclude that project (b), as a whole, constituted the improvement of a highway of interstate commerce and that the plaintiffs thereon employed were engaged in commerce and were within the coverage of the Act.

That the doctrine of new construction may not appropriately be applied to cases like the instant case is amply supported. In the Loftis case, supra, the plaintiff was a watchman employed by the defendant during the construction of a new bridge intended as a replacement for an older bridge that was part of an interstate highway. The new bridge was located at a distance from the old bridge and was not used in commerce during its construction. Nevertheless the court held that the plaintiff was engaged in commerce, saying [Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 291]: "However, this 'new construction' doctrine has no bearing on the instant case, because the bridge here in question, although a new structure, was being built to replace an existing structure which had long been used in interstate commerce."

In Ritch v. Puget Sound Bridge & Dredge Co., 9 Cir., 156 F.2d 334, and Walling v. Mc Crady Const. Co., 3 Cir., 156 F.2d 932, 935, the proposition that the doctrine of new construction is not applicable to cases similar to the instant case is recognized and supported.

The case of Nieves v. Standard Dredging Corp., supra, cited by the defendant in support of his contention, is clearly distinguishable from the instant case. In that case the body of water in which the dredging was performed, Puerca Bay, had been found not to be a highway of interstate commerce, the court saying, 152 F.2d at page 719: "* * * The bay itself had not been used by ships of any kind for the purpose of delivering or receiving merchandise to or from Puerto Rico."

In the instant case the waterway was and is a highway of interstate commerce. The case of Brue v. J. Rich Steers, Inc., supra, also cited by the defendant, is likewise distinguishable from cases similar to the instant case. In that case the court said, 60 F.Supp. at page 670: "The facts in the case at bar distinguish it from Walling v. Patton-Tulley Transportation [6 Cir., 134 F.2d 945], for in the present case, while the structure fronts the river and extends into the river, it was not intended as an aid to commercial navigation; has no relation to river traffic; has no more effect on the current or flow than any building fronting on the river."

While both cases so cited by the defendant provide excellent examples of a proper application of the doctrine of new construction, neither is in point with the instant case.

█ It is my conclusion, therefore, that all the dredging projects under consideration that were performed in San Juan Bay were projects involving the repair, maintenance or improvement of a highway of interstate commerce and that those plaintiffs thereon employed were engaged in commerce and are within the coverage of the Act.

█ Turning to project (e) which involved dredging performed in Arecibo harbor, there would be little question but that this work constituted an engagement in commerce, but for an extraordinary circumstance. The record reveals that at the time of the dredging under consideration Arecibo harbor had been withdrawn from interstate commerce. The trial judge found as a fact that this harbor had been closed to commerce both before and after the dredging. In concluding that work thereon was not an engagement in commerce, the trial judge relied upon the authority of Industrial Accident Commission of California v. Davis, 259 U.S. 182, 42 S.Ct. 489, 66 L.Ed. 888, which is cited with approval in Nieves v. Standard Dredging Corp., supra. In that case it was held that a facility of interstate commerce may be withdrawn from such commerce. Therefore, I can perceive no valid reason for altering the conclusion of the trial judge that the work involved in the dredging of Arecibo harbor did not constitute an engagement in interstate commerce.

The defendant has further contended that those plaintiffs who were employed by

the defendant as galley help aboard its dredges, a classification including cooks, stewards, cooks helpers, mess boys and dish washers, even though they were performing such services for other employees who were engaged in commerce, were not themselves engaged in commerce or in an occupation so closely related to commerce as to be a part of it, and, therefore, they are not included within the coverage of the Act.

In no case brought to the attention of the court has the precise question been considered of whether galley help employed aboard a dredge during dredging operations is engaged in commerce. In Walling v. Great Lakes Dredge & Dock Co., 7 Cir., 149 F.2d 9, and in Sternberg Dredging Co. v. Walling, 8 Cir., 158 F.2d 678, the question before the court was whether dredge workers were seamen within the meaning of the exemption of section 213(a) (14), 29 U.S.C.A. In each case the defendant conceded that the dredge workers were engaged in commerce and it is not apparent that the galley workers involved were excepted from the terms of this concession.

In Walling v. Bay State Dredging Co., 1 Cir., 149 F.2d 346, the court found that dredge workers were engaged in commerce and it appears from the stipulations filed in that case that the galley employees involved were included in the group of workers under consideration. 149 F.2d at page 350 of the reported opinion, the court said: "It was the purpose of the Act to establish maximum hours and minimum wages for workers in interstate commerce. Dredge-workers are in that group."

In Mc Leod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538, the Supreme Court stated that the test to determine whether an employee is engaged in commerce is: "* * * not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it."

This test draws a very fine distinction and is one which is difficult of application.

In the Threlkeld case, supra, the defendant was an independent contractor who, under a contract with a railroad company, provided meals for the railroad's maintenance of way men. The plaintiff was a cook employed by the defendant to prepare these meals in a dining car that was sent to various points along the railroad's right of way where the maintenance of way men were working. The court held that the plaintiff was not engaged in commerce, saying, 319 U.S. at page 497, 63 S.Ct. at page 1252, 87 L.Ed. 1538: "* * * Here the employee supplies the personal needs of the maintenance-of-way men. Food is consumed apart from their work. The furnishing of board seems to us as remote from commerce, in this instance, as in cases where employees supply themselves. In one instance the food would be as necessary for the continuance of their labor as in the other."

However, in considering the Threlkeld case, supra, the court considered, but did not follow the rule laid down in Philadelphia, Baltimore & Washington R. R. v. Smith, 250 U.S. 101, 39 S.Ct. 396, 63 L.Ed. 869, apparently because it did not think it controlling in view of the factual situation in the Threlkeld case. In the Smith case, an employee of an interstate railroad, whose duties it was to cook meals and care for the needs of a gang of bridge carpenters, in a camp car which was provided for that purpose and which was moved from place to place along the railroad line to facilitate their work in repairing bridges, was held to be engaged in interstate commerce within the meaning of the Federal Employers Liability Act, 45 U.S.C.A. § 51 et seq. In that case the court said: "It may be freely conceded that if he had been acting as cook and camp cleaner or attendant merely for the personal convenience of the bridge carpenters, and without regard to the conduct of their work, he could not properly have been deemed to be in any sense a participant in their work. But the fact was otherwise. He was employed in a camp car

which belonged to the railroad company, and was moved about from place to place * * * according to the exigencies of the work of the bridge carpenters, no doubt with the object and certainly with the necessary effect of forwarding their work * * *. The significant thing, in our opinion, is that he was employed by defendant to assist, and actually was assisting, the work of the bridge carpenters by keeping their bed and board close to their place of work, thus rendering it easier for the defendant to maintain a proper organization of the bridge gang and forwarding their work by reducing the time lost in going to and from their meals and their lodging place."

■ It may reasonably be assumed then, that the Threlkeld case and the Smith case represent applications of the test in slightly different factual situations and that the one indicates an area of activity that is not an engagement in interstate commerce while the other indicates an area of activity which is an engagement in such commerce. That being so, it appears that when the employment of such a type of employee is solely for the convenience of other employees who are engaged in commerce, such employee is not thereby engaged in such commerce. However, when the work of such an employee is necessary in order that other employees engaged in commerce may efficiently and effectively perform their work, then, inasmuch as the work of such an employee sustains and forwards the work of the others, he is engaged in an activity so closely and directly related to commerce as to be a part of it.

It is my opinion that the factual situation in the Smith case, supra, reflects the status of galley employees employed on the defendant's dredges in the instant case. A dredge is not an ordinary industrial machine. Its function is submarine excavation, a peculiar kind of industrial activity and one for which a dredge is peculiarly designed. Its function is performed while afloat, usually at some distance from land and, frequently in areas remote from settled communities. It is

in the owner's economic interest that the dredge function efficiently and sofar as is practical, continuously, during the course of a dredging operation. These factors make it compulsory that certain essential employees be aboard the dredge at all times and frequently for prolonged periods of time.

Because of this, undoubtedly, the owners have elected to provide quarters and facilities aboard the dredge that make it possible for these employees to remain aboard. These include housing and kitchen facilities, and, what is absolutely essential, employees to utilize these facilities. It is not merely for the convenience of the dredge crew that these facilities and employees are provided. It is to ensure, so far as it can practically be done, that the dredge and the workers thereon will function and work without undue interruptions in the economic interest of the owners and, consequently, in the interest of efficient and economic repair or improvement of facilities of commerce. That there is a direct and close relationship between activities which sustain and forward the work of workers in interstate commerce and the commerce itself, I think, is obvious.

■ I am of the opinion that the galley workers employed aboard the dredges of the defendant by reason of their activities directly assisted in and sustained the work of other employees who were engaged in interstate commerce and that they were therefore engaged in an activity so close and directly related to commerce as to be a part of it. Therefore, I conclude that the galley workers were engaged in commerce and are within the coverage of the Act.

On rehearing the defendant also urged that the trial judge erred in concluding that none of the plaintiffs were seamen within the meaning of that term as it is used in the exemption of section 213(a) (14) 29 U.S.C.A. in that those plaintiffs who were employed by the defendant as captains and deckhands aboard its launches were seamen within the meaning of the exemption.

■ Because of the remedial nature of the Act it is well settled that exemptions to its coverage are to be construed strictly. In A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, it was said of these exemptions: "Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakeably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

The defendant then, must show clearly, that the plaintiffs who were employed as captains and deckhands aboard its launches were seamen within the meaning of the exemption.

■ The status of an employee as a seaman within the meaning of the phrase "employee employed as a seaman" in section 213(a) (14) 29 U.S.C.A., depends upon the character of the work the employee actually performs and not on what it is called or the place where it is performed, and where the dominant employment is clearly industrial in character and work of a maritime nature only incidental or occasional, the employee is not a seaman within the meaning of the exemption. Walling v. W. D. Haden Co., 5 Cir., 153 F.2d 196, 199; Anderson v. Manhattan Lighterage Co., 2 Cir., 148 F.2d 971; Gale v. Union Bag & Paper Corp. 5 Cir., 116 F.2d 27.

In the instant case, testimony adduced on behalf of the plaintiffs indicates that the plaintiffs who were employed as captains and deckhands aboard the defendant's launches were engaged primarily in an industrial activity, in work which was an integrated part of a dredging operation and which was not maritime in nature or performed in furtherance of transportation. It appears that these launch crews did substantially most of their work in disconnecting and connecting the pipe lines through which dredged material is pumped for deposit in designated spoil areas and in placing, replacing, extending and controlling these pipe lines. They also moved and secured the anchors of the dredges and otherwise serviced the dredge. On the other hand there is nothing in the record to indicate that these particular plaintiffs performed any consequential amount of work that was maritime in its nature or which was designed to further transportation.

■ I am of the opinion that the defendant has not established clearly that the plaintiffs who were employed by it as captains and deckhands aboard its launches were seamen within the meaning of the exemption contained in section 213(a) (14) 29 U.S.C.A., and, I, therefore, refrain from altering the conclusion of the trial judge that none of the plaintiffs were seamen within the meaning of the exemption.