## ATLANTIC, GULF AND PACIFIC COMPANY *v.* STATE DEPARTMENT OF ASSESS-MENT AND TAXATION

[No. 13, September Term, 1968.]

*Decided January 15, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Albin M. Plant* and *George D. Hubbard,* with whom were
*Semmes, Bowen & Semmes* on the brief, for appellant.

*Anthony M. Carey, Assistant Attorney General,* with whom
was *Francis B. Burch, Attorney General* on the brief, for ap-
pellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves an exemption from tangible personal
property taxation of the dredge *Pittsburgh,* owned and operated
by the appellant, Atlantic, Gulf and Pacific Company (Atlantic)

for the taxable year 1965. The appellee, State Department of Assessments and Taxation of Maryland (State) denied the exemption and was sustained in this action by both the Maryland Tax Court and the Baltimore City Court.

The facts are not in dispute. Atlantic, a West Virginia corporation, was incorporated in 1899. It is and has been engaged in the hydraulic dredging business. It has no regular place of business in Maryland but is qualified to do business in this State.

Atlantic's dredge *Pittsburgh* worked in the Chesapeake and Delaware Canal in Maryland from April 23 to May 25, 1964. Prior to that time it had not worked in Maryland. It worked on another job in that canal from April 2, 1965 to July 1, 1965. It worked in Baltimore Harbor from June 2 to August 3, 1964 and also from September 10, 1964 to March 11, 1965.

Prior to April 23, 1964, when the *Pittsburgh* first worked in Maryland, it had worked in New York and Connecticut in 1955, in Connecticut and Massachusetts in 1956, in New York and Massachusetts in 1957, in New Jersey in 1958, in Virginia and West Virginia in 1959, in New Jersey and New York at various times during 1960, 1961 and 1962 and in Florida in 1964. The *Pittsburgh* worked in Philadelphia, Pennsylvania from August 9, 1965 to October 5, 1965.

The *Pittsburgh* is one of seven dredges owned by Atlantic on January 1, 1965, the date of finality in this case. It was built in 1914 and is 192 feet long. It was revitalized in 1964 at a cost of approximately $300,000 in order to permit it to compete more favorably with more recently constructed dredges. It is a registered vessel, with an official number assigned by the United States Collector of Customs; it is documented as a dredge and can be towed anywhere in the world. It carries all the equipment used by it in its dredging operations, except for two storage barges, which the State also assessed, and certain other vessels which accompany it as an operating unit.

The *Pittsburgh*, when in operation, works 24 hours a day, seven days a week. When in operation, there are three shifts with a total payroll of between 85 and 90 men. It has a commissary and sleeping quarters for 15 to 20 men. It widens or deepens the channel of the waterway by submerging a ladder,

with a high powered cutter, to the bottom. The material that is dug up, whether sand, clay or rock is sucked up through a suction pipe, goes through a pump and is pumped out of the back of the dredge through a pipe, which may be as much as 2000 feet in length, to a designated disposal area. It has no motive power of its own but is towed from location to location. When working, it is attached to anchors and is moved by the use of cables attached to a derrick winch.

The State, finding the *Pittsburgh* in Maryland waters on the date of finality, January 1, 1965, entered a tangible personal property assessment in the amount of $786,500 for the taxable year 1965. This assessment in its entirety was certified to Baltimore City. The foreign corporation assessor for the Department testified that it had been the long practice of the Department to assess a dredge without proration if the dredge was found within Maryland on a date of finality. He testified that during his 20 years of service as an assessor, the Department had always interpreted the provision set forth in Code (1957), Article 81, Section 9, subsection (26), which provides an exemption for "all ships, or other vessels, including aircraft which are regularly engaged in commerce, in whole or in part, outside the territorial limits of this State," as not applicable to a dredge but only to vessels "that may be engaged in foreign commerce in the transport of goods and people." He conceded that the *Pittsburgh* was a "vessel" within the meaning of the language of the exemption.

Atlantic does not challenge the *amount* of the assessment; its challenge is addressed to the *validity* of the assessment.

Atlantic advances two propositions in this appeal: (1) the trial court erred in finding that the *Pittsburgh* was not a vessel "engaged in commerce, in whole or in part, outside the territorial limits" of Maryland, and thus exempt from taxation pursuant to the plain and unambiguous meaning of the words of the statutory exemption either alone or as reinforced by the history of the legislation and (2) that if the tax were otherwise applicable as the State contends, it would be unconstitutional as an unapportioned tax upon an instrumentality of interstate commerce and thus prohibited by the commerce clause of the Federal Constitution as construed by the cases.

As we agree with Atlantic's first proposition, we will reverse the order of the lower court, but accordingly, we do not find it necessary to pass upon the merits of the constitutional challenge to the statute advanced by Atlantic.

(1)

The language used in the statute itself is the primary source for determining the legislative intent. As we stated in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 477-78, 209 A. 2d 582, 588 (1965) :

> "The cardinal rule of construction of a statute is to discover and to carry out the real legislative intention. *Barnes v. State, ex rel Pinkney,* 236 Md. 564, 574; 204 A. 2d 787, 792 (1962). *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 129 A. 2d 63 (1957). The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature. *Board of Supervisors of Election of Baltimore City v. Weiss,* 217 Md. 133, 141 A. 2d 734 (1958). See particularly the comprehensive review of the prior Maryland cases at pages 136 and 137 of 217 Md. If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no constitutional guarantees are impaired by the legislation. *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946)."

Article 81, Section 9 (26) as it appears in the Maryland Code is as follows :

> "(26) *Vessels and aircraft engaged in interstate commerce*—All ships or other vessels, including aircraft, which are regularly engaged in commerce,[1] in

---

1. It is to be observed that in the body of the legislation the

whole or in part, outside the territorial limits of this State."

To be entitled to the exemption, the property owner must under the statute establish three essential elements:

1. That the property is a *vessel* (or aircraft)
2. That it is *regularly* engaged in *commerce* and
3. That this occurs in *whole* or *in part, outside* the territorial limits of Maryland.

In our opinion, Atlantic has successfully established all three of the essential elements.

The first element, *i.e.*, that the property is a "vessel," was conceded by the foreign corporation assessor for the State and by counsel for the State in the Maryland Tax Court as well as in the State's brief and argument before us.[2] This element is therefore established by the property owner.

Nor is the third element, *i.e.*, that its use and work occurs *in part* outside the territorial limits of Maryland, in dispute. The times and places of the *Pittsburgh's* use and work in other

word "commerce" is used without limitation, but in the headline of Section 9 (26) the words are "engaged in *interstate* commerce."

Although possibly of minimal importance in the present case, it should be pointed out that Code (1957), Article 1, Section 18 (1968 Repl. Vol.) provides: "The captions or headlines of the several sections of this Code which are printed in bold type, and the captions or headlines of the several subsections of this Code which are printed in italics or otherwise, are intended as mere catchwords to indicate the contents of the sections and subsections. They are not to be deemed or taken as titles of the sections and subsections, or any part thereof; and, unless expressly so provided, they shall not be so deemed or taken when any of such sections and subsections, including the captions or headlines, are amended or reenacted."

2. There is little doubt that this concession was entirely proper in view of the unanimity of the authorities holding that dredges and barges are vessels. See *Summerlin v. Massman Const. Co.*, 199 F. 2d 715 (4th Cir. 1952); *Maryland Casualty Co. v. Lawson*, 94 F. 2d 190 (5th Cir. 1938); *Kibadeaux v. Standard Dredging Co.*, 81 F. 2d 670 (5th Cir. 1936); *Butler v. Ellis*, 45 F. 2d 951, 955 (4th Cir. 1930); *The Alligator*, 161 Fed. 37 (3rd Cir. 1908); *Early v. American Dredging Co.*, 101 F. Supp. 393 (E.D. Pa., 1951); and *Charles Barnes Co. v. One Dredge Boat*, 169 Fed. 895 (E.D. Ky., 1909).

jurisdictions have been fully set forth, and no argument is made by the State in regard to that element.

The principal dispute and, in fact, the only issue contested in this case, is whether or not the *Pittsburgh* was "regularly engaged in commerce." There is no question raised in regard to the regularity of the engagement of the *Pittsburgh* as the proof indicates that it is constantly used in dredging, 24 hours a day and seven days a week. This has been the usual and constant method of operation over the past five year period in the various locations in which the *Pittsburgh* was used.

In considering the meaning of the word "commerce," it should be observed that the General Assembly used the general word "commerce" without limitation. There are no qualifying words.

In Webster's New Twentieth Century Dictionary, Unabridged, 2d ed, 1964, "commerce" is defined as:

> "1. An interchange of goods, wares, productions or property of any kind, between nations or individuals, either by barter or by purchase and sale; trade; traffic. Syn. barter, business, communication, dealing, exchange, intercourse, trade, traffic."

"Commercial" is defined as "1. Of or pertaining to commerce. * * * 3. Made or done for sale or profit."

In 15 C.J.S. *Commerce* § 1, at 383-84 (1967), the following appears:

> "The question of what is commerce is to be approached both affirmatively and negatively, that is, from the points of view as to what it includes and what it excludes. While commerce includes trade, traffic, the purchase, sale, or exchange of commodities, and the transportation of persons or property, whether on land or water or through the air, according to various definitions of the term, and also, as indicated infra §§ 23, 26, according to judicial exposition apart from formal definitions, nevertheless commerce is broader than, and is not limited to, trade, traffic, transportation, or the purchase, sale, or exchange of goods or commodities."

See also 15 Am.Jur.2d *Commerce* § 2 at 631-32 (1964).

It should also be observed that the word "commerce" is used in Article 1, Section 8 of the Federal Constitution in granting the power to the Congress: "To regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes; * * *."

The word "commerce" has been broadly construed by the Courts, both State and Federal, and we must assume that the General Assembly in using the word "commerce" without qualification intended that it receive a similar construction by the Courts. Cf. *Maryland-National Capital Park and Planning Comm'n v. Silkor Development Corp.,* 246 Md. 516, 524, 229 A. 2d 135, 140 (1967) ; *St. Joseph Hospital v. Quinn,* 241 Md. 371, 379, 216 A. 2d 732, 736 (1966).

In the Federal decisions, there is little doubt that the *Pittsburgh* was engaged in interstate commerce. As the Supreme Court of the United States stated in *Mitchell v. C. W. Vollmer & Co., Inc.,* 349 U. S. 427, 429-30, 75 S. Ct. 860, 862, 99 L. Ed. 1196, 1200 (1955)—a case involving the applicability of the Fair Labor Standards Act to employees working on construction of an embankment and concrete platform for a canal lock:

> "Repair of facilities of interstate commerce is activity 'in commerce' within the meaning of the Act as we held in Fitzgerald Construction Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316. And we think the work of improving existing facilities of interstate commerce, involved in the present case, falls in the same category."

See *Overstreet v. North Shore Corp.,* 318 U. S. 125, 63 S. Ct. 494, 87 L. Ed. 656 (1943). See also *Mitchell v. Emala & Associates, Inc.,* 274 F. 2d 781 (4th Cir., 1960).

Dredges were specifically held to be engaged in interstate commerce in *Walling v. Sternberg Dredging Co.,* 64 F. Supp. 758 (E.D. Mo. 1946), *aff'd,* 158 F. 2d 678 (8th Cir. 1946), and in *Cuascut v. Standard Dredging Corp.,* 94 F. Supp. 197 (D. Puerto Rico 1950).

The evidence indicated conclusively that the *Pittsburgh* is used by a purely *commercial* corporation *to earn a profit* in

its operation as the fact that the owner corporation expended some $300,000 to make the *Pittsburgh* more competitive clearly indicates. The *Pittsburgh* is obviously not a pleasure craft, the operation of which is not connected with any profit or financial gain to its owner. See *Guinness v. King County*, 32 Wash. 2d 503, 202 P. 2d 737, 6 A.L.R. 2d 1361 (1949), in which the Supreme Court of Washington held that a yacht, used solely for pleasure cruising and operating out of the Port of Seattle during World War II, was not engaged in "commerce" and the imposition of a personal property tax on the yacht by King County, Washington did not constitute an interference with "commerce." The yacht was held to have acquired a situs for local taxation in the State of Washington.

We cannot accept the result urged upon us by the Department and in which the Maryland Tax Court acquiesced as they have both seemingly *added* by construction to the legislative provision after the word "aircraft," the words "being propelled from place to place in the carriage of goods and/or passengers, or handling some commodity involved in trade." The General Assembly could have added these words, but the plain fact is that it chose not to add such qualifying language. Indeed, the legislative history of the legislation precludes such a construction as it seems clear to us that the legislative intent was to liberalize the language of the exemption by a progressive *removal of restrictive language* upon its applicability.

The original legislation on this subject appeared in the Laws of 1924, Chapter 264, which provided:

> "All vessels of over five hundred (500) deadweight tons registered at any port in this State and owned by an American citizen, partnership or association, or by any corporation incorporated under the laws of the State of Maryland, regularly engaged in *foreign or coastwise commerce, between any port in the State of Maryland as the port of origin and terminus of their respective voyages and any other port or ports beyond the limits of the Chesapeake Bay and its tributaries,* are exempted from all taxation in this State for State or local purposes. * * *." (Emphasis supplied.)

182

It will be observed that the exemption was limited to a vessel which began and terminated its voyage in Maryland.

Chapter 264 of the Laws of 1924 was amended by the Laws of Maryland 1929, Chapter 226, which reads as follows:

"Vessels of over five hundred (500) dead weight tons registered at any port in this State owned by American citizens or partnerships or by any domestic corporation regularly engaged in foreign or coastwise commerce *between any port in the State of Maryland and any port or ports beyond the limits of the Chesapeake Bay and its tributaries,* provided that the exemption granted by this sub-section shall end December 31, 1935." (Emphasis supplied.)

It will be noted that Chapter 226 of the Laws of 1929 *broadened* the exemption by eliminating the requirement that the vessel depart from and return to a Maryland port.

By the Laws of 1931, Chapter 425 the exemption *was extended* to "aircraft of over five (5) dead weight tons."

The Laws of 1941, Chapter 912, which enacted the exemption in its present form further liberalized the exemption and removed the restriction on the size of vessels, their registration in any port in Maryland, their ownership by an American citizen or "domestic corporation" and the language "between any port in the State of Maryland and any port or ports beyond the limits of the Chesapeake Bay and its tributaries" was also eliminated.

Although it is not necessary to review the legislative background of the present statutory provision in order to discover the meaning of the words used by the General Assembly inasmuch as, in our opinion, the words are clear and unambiguous, a consideration of this legislative background is helpful in indicating that the General Assembly did not intend the language used in Chapter 912 of the Act of 1941 to be construed otherwise than in accordance with its normal, broad meaning.

The State relies upon two maxims of statutory construction, *i.e.,* (1) that tax exemptions are to be narrowly construed, and (2) that where the legislation is susceptible of two constructions, a long continued and unvarying construction applied by

the administrative officials administering the statute in question is strongly persuasive and should not be disregarded by the courts except for weighty reasons. These maxims are well established and often useful in proper cases, but they are not applicable here as we find no unclear or ambiguous language which needs to be construed, nor does the alternative construction urged upon us by the State appear to us to be a reasonable interpretation of the language of the statute. As Chief Judge Brune, for the Court, stated in *Armco Steel Corp. v. State Tax Comm.*, 221 Md. 33, 40-41, 155 A. 2d 678, 681 (1959) :

> "The usual rule in tax exemption cases is that the exemption is to be strictly construed, but it should not be so strictly construed as to defeat the intent of the enacting body. *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 106 A. 2d 119; *John McShain, Inc. v. Comptroller*, 202 Md. 68, 95 A. 2d 473; *Shaughnessy v. Linguistic Society of America*, 198 Md. 446, 84 A. 2d 68; *Clarke v. Union Trust Co. of D. C.*, 192 Md. 127, 63 A. 2d 635. However, 'strict construction does not require that an unreasonable or unusual meaning must be given to the words used in exemption statutes.' *State Tax Commission v. Whitehall Foundation, Inc.*, 214 Md. 316, 320, 135 A. 2d 298."

It is well settled that where the language of a statute is clear and unambiguous, an administrative interpretation contrary to that clear and unambiguous meaning will not be given effect by this Court. *Department of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 669, 234 A. 2d 255, 258-59 (1967) ; *Smith v. Higinbothom*, 187 Md. 115, 132, 48 A. 2d 754, 763 (1946).

The Maryland Tax Court in its opinion (adopted by the lower court as its opinion) relied upon the decision of the Supreme Court of Washington in *North America Dredging Co. v. Taylor*, 56 Wash. 565, 106 Pac. 162 (1910), in which it was held that the dredge in that case had established a tax situs in the State of Washington and was not a vessel "sailing from one port to another as a carrier of State, interstate or international traffic" and thus, according to the law of Washington then effective, taxable *only* in its *State of domicile*. The *North Ameri-*

*can Dredging Co.* case was not concerned with any definition or construction of the word "commerce" and indeed, there was no question in regard to the interpretation of the Washington statute. In our opinion, reliance upon this case by the Maryland Tax Court was misplaced and it does not support the finding by that court that the *Pittsburgh* was not engaged in commerce within the meaning of that word as used in the Maryland statute.

### (2)

Atlantic earnestly urges upon us that, in any event, if otherwise applicable, the tax in this case would be unconstitutional as an unapportioned tax upon an instrumentality of interstate commerce and prohibited by the commerce clause of the Federal Constitution and the cases construing that clause. Atlantic forcefully argues that under the decisions of the Supreme Court of the United States, a State may validly levy a tax upon an instrumentality of interstate commerce only if the State taxes on the basis of some fair apportionment formula reflecting the time the personal property is situated in or used in the taxing state, relying on *Central Railroad Co. v. Pennsylvania,* 370 U. S. 607, 82 S. Ct. 1297, 8 L.Ed.2d 720 (1962). Atlantic also points out that the presence of the *risk* of multiple taxation is sufficient to render invalid an unapportioned tax on an instrumentality of interstate commerce citing several Federal cases apparently establishing this principle. Atlantic's argument is persuasive, but, as we have indicated, we need not pass upon this interesting question in view of our agreement with Atlantic on its first point, *i.e.,* that it is entitled to the exemption under the language of the statute itself. It is highly probable that the General Assembly used the word "commerce" without limitation and in its broad sense in order to avoid the constitutional conflict with the commerce clause of the Federal Constitution which would almost inevitably otherwise occur from the attempted imposition of an unapportioned tax. Our construction effectuates this policy.

*Order reversed, the appellee to pay
the costs.*