CONTINENTAL DREDGING COMPA-
NY, a corporation, Plaintiff,

v.

COUNTY OF LOS ANGELES,
Defendant

No. 72-2517-EC.

United States District Court,
C. D. California.

Aug. 9, 1973.

Dietsch, Gates, Morris & Merrell, by Brownell Merrell, Jr., Los Angeles, Cal., for plaintiff.

John H. Larson, County Counsel, and James Dexter Clark, Deputy County Counsel, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

CRARY, District Judge.

Plaintiff seeks recovery of ad valorem property taxes levied by Los Angeles County against its vessel "SEALANE", a self-propelled dredge, for the years 1969 and 1970, and paid under protest. The vessel, originally constructed in 1945 as a T–2 tanker, was converted to a self-propelled dredge in 1956.

The levy of the tax is asserted to be invalid under the provisions of the Commerce Clause of the Constitution, Article I, § 8, Clause 3, and the Treaty of Friendship between the United States and the Republic of Liberia (54 U.S. Statutes 1739).

The case was tried by the Court on the following stipulated facts:

(1) As of the lien dates, March 1, 1969, and March 1, 1970, the SEALANE was, and now is, registered under the flag of the Republic of Liberia and has been so registered since it was acquired by the plaintiff Company on November 4, 1963. Since that date the vessel has been plaintiff Company's sole asset.

(2) Plaintiff Company, a Liberian corporation, was, on the lien date and now is, the only wholly-owned subsidiary of Universe Tankships, Inc., also a Liberian corporation, which in turn is a wholly-owned subsidiary of Oceanic Tankships, S. A., a Panamanian corporation. Daniel K. Ludwig, a citizen of the United States domiciled in New York, beneficially owns 100% of the stock of all three of the above named companies but does not engage in their day to day activities.

(3) Plaintiff has not maintained an office in any state in the United States but does maintain a qualified resident business agent (a trust company) in Liberia which transfers the payment of statutory fees to the Government of Liberia.

(4) The SEALANE has not engaged in any contract, charter or other operations within the County of Los Angeles or State of California.

(5) She made four visits to Long Beach and San Pedro harbors between 1956 and 1964 for equipment installation and repairs. On July 12, 1964, she put into Todd Shipyards for repairs and since that date has been, and now is, laid up in inactive status.

(6) While in operation the vessel was engaged in foreign commerce.

(7) She is subject to reactivation from inactive status and layup in the event contract, charter or other utilization for the vessel is available. Some funds have been expended for repair, maintenance and insurance of the vessel but the estimated cost of the reactivation from inactive status in the event of

contract, charter or other utilization is $600,000 dollars as of the lien date.

(8) On nine occasions between 1964 and 1971, plaintiff "has been approached" by various foreign governments and companies as to the feasibility of again operating the vessel in foreign waters but for "various reasons", unstated in the stipulation, the vessel was not reactivated or utilized.

(9) Neither the Republic of Liberia nor any political subdivision thereof, has levied an *ad valorem* property tax on any vessel registered in the United States or in the Republic of Liberia.

It appears from the stipulated facts that the SEALANE, as of July 12, 1964, when she put into Todd Shipyards, Los Angeles harbor, for repairs, was an instrumentality of foreign commerce with her "home port" in Liberia. Defendant contends the vessel has lost that status by remaining continuously in Los Angeles harbor since July, 1964, in an inactive status of disrepair. The plaintiff asserts the SEALANE has, at all pertinent times, been and now is an instrumentality of and engaged in foreign commerce.

The determinative issue, as concerns the commerce clause, appears to be, has the vessel lost her status as one engaged in foreign commerce under the particular facts and circumstances of this case?

■■ It does not appear to be disputed that tangible personal property is ordinarily taxable at the situs where it is actually located irrespective of the domicile of the owner thereof. It is also established that an exception to this rule is that a vessel which is an instrumentality of foreign commerce and engaged therein is subject to property tax only at its "home port" regardless of where it happens to be actually located on tax assessment day.

The home-port rule originally provided that the taxable situs of ocean-going vessels was exclusively within the domicile of the owners thereof and the place of registration. Hays v. Pacific Mail Steamship Co., 58 U.S. 596, 17 Haw. 596, 15 L.Ed. 254 (1854). *Hays* involved ships in interstate commerce but the rule stated in *Hays* applies to foreign commerce as well. Subsequent decisions have eroded the rule with respect to interstate commerce only, now providing for local taxation on an apportioned basis in many circumstances. See dicta in Scandinavian Airlines v. County of Los Angeles, 56 Cal.2d 11, 14 Cal.Rptr. 25, at 29–34, 363 P.2d 25 (1961), where the Court held that a two-day stopover was insufficient to alter foreign situs. Although the theories supporting the home-port rule have shifted over the years (see *Scandinavian,* supra, at 32, 363 P.2d 25, commerce clause, due process clause, supremacy clause), the rule itself with respect to foreign commerce remains intact.

■ As stated by the Court at p. 36, 363 P.2d at p. 36 of its opinion:

"Ocean going vessels, plying international waters, engaged in either interstate or foreign trade, even when owned by residents or citizens of this country, may not be taxed by any jurisdiction other than that of their home port, * * *."

Thus, for purposes of this case, the question remains whether the vessel herein may be deemed to be engaged in foreign trade while laid up for several years.

Plaintiff cites the case of Guinness v. King County, 32 Wash.2d 503, 202 P.2d 737 (1949), which held that a foreign vessel was not subject to state property tax even though the vessel remained in the local harbor for a period of five years, from 1940 to 1945. The facts of the case reveal that the stay was during wartime and the funds of the owner of the vessel were frozen. The Court found that it was impossible for the owner to remove the vessel and that he thus had no power of control over its location and that although the stay was prolonged it was only "temporary."

The California case of Los Angeles County v. Craig, 38 Cal.App.2d 58, 100

P.2d 818, is also relied on by plaintiff in support of its position that a layup because of inability of the owner to obtain business or work for the ship for a period of over one year did not warrant the County taxing it, on the theory that because of its inactivity the vessel was not "engaged in the transportation of freight or passengers."

The Court held the vessel was exempt from taxation because it was only "temporarily" out of service. It is also to be noted that " * * * *the engines were turned over regularly and the vessel was kept in condition for active duty at all times and that it was put back into active service * * * in August, 1933.*" (Page 821.) Emphasis added.

### TREATY OBLIGATIONS

It is argued by the plaintiff that the levy of the tax by Los Angeles County would violate the terms of the Treaty of Friendship between the United States and the Republic of Liberia (54 U.S. Stats. 1739, Aug. 3, 1938), referring particularly to Article XV which concerns the discharge of cargo at foreign ports, and the second paragraph of Article I, p. 1740, which provides:

"The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence."

The reference in the Treaty to "nationals" does not include ships or vessels. The reciprocal treatment of vessels is provided for in Article XIV, p. 1745.

"The merchant or other private vessels and cargoes of one of the High Contracting Parties shall, within the territorial waters and harbors of the other Party in all respects and unconditionally be accorded the same treatment as the vessel and cargoes of that Party, irrespective of the port of departure of the vessel, or the port of destination, and irrespective of the origin or the destination of the cargo.

It is especially agreed that no duties of tonnage, harbor, pilotage, lighthouse, quarantine, or other similar or corresponding duties or charges of whatever denomination, levied in the name or for the profit of the Government, public functionaries, private individuals, corporations or establishments of any kind shall be imposed in the ports of the territories or territorial waters of either country upon the vessels of the other, which shall not equally, under the same conditions, be imposed on national vessels."

▪ Under the treaty provisions a local taxing authority in the United States may not levy a tax or other charges on a vessel registered in Liberia while in a port of the United States which would not be imposed, in the same circumstances, on vessels of United States registration.

▪ The provisions of the treaty would not appear to be applicable to the SEALANE if she is not engaged in foreign commerce, insofar as concerns local taxes.

The provisions of treaties with foreign states must be meticulously adhered to and ships of foreign registration which are engaged in foreign commerce must not be taxed by the local taxing authorities in this country where those vessels have put in for repairs for the purpose of continuing their participation in foreign commerce. A liberal allowance of time should certainly be made for layups for the purpose of repairs but in the instant case approximately five years elapsed before a tax lien was imposed and another four years has passed from that time to the date of trial with no semblance of an effort to make the repairs necessary to put the SEALANE in condition to again engage in foreign commerce. It is one thing to layup for repairs and take a liberal amount of time to make such repairs as may be necessary to put a vessel in condition to continue to engage in foreign commerce and quite another to lay a vessel up with no intention of making the necessary re-

pairs unless a contract can be negotiated for work which will justify repairs costing $600,000 dollars.

A liberal time period should also be allowed for a vessel to remain in a port to await work or cargo to continue its operation as an instrumentality in foreign commerce but with the expiration of nine years from the date of layup with apparent refusal to engage in foreign commerce until just the right situation develops which would justify economically a repair bill of $600,000 dollars, as of 1969, it would seem reasonable to conclude that the vessel has lost its status of one engaging in foreign commerce and is therefore subject to imposition of tax by the local taxing authorities. The continued depreciation of the SEALANE over the years has so depleted her value as to make the likelihood of her ever again engaging in foreign commerce progressively more remote.

These conclusions should in no way be deemed a violation of the treaty here involved.

 The plaintiff urges that the commerce clause should not be eroded by decisions of the several states as to when a foreign vessel loses its character as an instrumentality of commerce by acquiring "taxable situs." This point may have merit but it would appear that foreign registry alone is not sufficient to establish a ship as being an instrumentality in foreign commerce, and the Federal courts have jurisdiction to interpret the commerce clause and jurisdiction of any civil action founded on a claim or right arising under treaties of the United States. Title 28, U.S.C. §§ 1331 and 1441.

It has been stipulated that the tax imposed for the year 1970 was in the amount of $31,598.63. The tax rate for that year was 10.7234 and it is therefore apparent that the market value of the SEALANE, as fixed by the Assessor for 1970, was $1,178,460.00. It follows that in 1970 the cost of repairs was more than one-half the market value of the vessel. There would be reason to believe, in the circumstances, that the SEALANE was being depreciated with no evidence of any attempt to repair or reactivate her at a cost of $600,000 in March, 1969, which cost would increase each year thereafter.

As noted above, the terms of the treaty with Liberia would not affect the taxation of the SEALANE by Los Angeles County unless she is engaged in foreign commerce. The Court concludes that the SEALANE lost her status as a vessel engaged in foreign commerce and that the tax levied by the Los Angeles County is valid.

This Memorandum is to be deemed Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure. Counsel for the defendant is requested to prepare, serve and lodge a Judgment in accordance with the ruling herein.