ROBERT  FREEDMAN  *v.*  STATE  OF  MARYLAND
[No. 13, April Term, 1939.]

*Decided May 16th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Edward L. Ward,* for the appellant.

*William C. Walsh, Attorney General,* and *Paul C. Wolman, Assistant State's Attorney for Baltimore City,* with whom were *H. Vernon Eney, Assistant Attorney General, J. Bernard Wells, State's Attorney for Baltimore City,* and *Stewart Lee Smith, Assistant State's Attorney,* on the brief, for the State.

JOHNSON, J., delivered the opinion of the Court.

This appeal reaches us under the provisions of chapter 357, Acts of 1927, and is from a judgment and sentence of the Criminal Court of Baltimore City, finding appellant guilty of contempt of court, and imposing a fine of $100 and imprisoment for three hours in the Baltimore City Jail.

The alleged contempt was constructive, being based upon a letter written by appellant to the presiding judge of the Criminal Court concerning the case of Leroy J. Hennigan, scheduled for trial before him three days later.

Hennigan, an employe of the Sun Cab Company, had been indicted by the grand jury for the crime of transportation for immoral purposes. Code, art. 27, sec. 514. His trial was scheduled for Tuesday, December 27th, 1938. Robert Freedman, who had lived in Baltimore for four years, was the manager of the Sun Cab Company

and had under him 750 employes of the company, including Hennigan. The latter had asked Freedman to appear in the Criminal Court on the date of his trial to testify for him as a character witness, and Freedman had agreed to do so, but on December 24th he recalled that on the date of the trial fourteen automobile sedans and three automobile trucks were to be sold at 11 A. M. at the Mid-City Garage in Baltimore City under a chattel mortgage held by his employers, who were out of the city. It was therefore necessary for him to attend the sale, inspect the vehicles, and represent his employers. In order to do this, his presence was required at the garage at 10:30 A. M., December 27th. On December 24th, when he realized the necessity for his presence at the sale, he dictated to his secretary, who mailed to the trial judge at his residence, the following letter upon the stationery of the Sun Cab Company:

"Honorable Sir:

"On Tuesday, one of our drivers by the name of Leroy J. Hennigan will be brought before you on a charge of solicitation for immoral purposes. I hope that you will not consider it presumptious on my part in writing you on this subject before the case is formally presented to you, but since this is the first time in the four years that I have managed the affairs of the Sun Cab Company, that I have ever come to aid of any of our drivers for any offences that they are charged with, I trust you will forgive me.

"Hennigan has been in our employ since June, 1937, and I have considered him to be one of the best men in our employ. He has always conducted himself like a gentleman, has been solicitous of the welfare of the Sun Cab Company and its patrons and we have never had a complaint against him of any form. In fact, I have always considered him to be a gentleman, moral and honest. He told me exactly what had occurred and in view of my past experience with him, I believe what he told me to be true.

"Sun Cab Company has no time for any man accused or involved in any immoral or dishonest activites and has invariably not only discharged such men against whom accusations have been made, but has also notified all other companies for the welfare of the taxicab industry as a whole and would or will do the same in this case, if satisfied that he is guilty. We feel we have this moral obligation to our patrons and we put this before the individual welfare of our drivers.

"Yours very truly,
"Sun Cab Company,
"Signed: Robert Freedman
"Robert Freedman."

Shortly after receipt of this letter, the judge delivered it to the state's attorney, who, in a petition addressed to the same judge, charged that Freedman, in writing the letter and therein discussing the case and particularly "the character and reputation of the said Leroy J. Hennigan," was guilty of improper conduct and in contempt of that court, and prayed that he be required to show cause why he should not be so adjudged. Upon that petition a citation was issued, and in response thereto, on December 29th, appellant appeared with counsel, answered the petition, and, at the hearing thereon, testified under questioning of his counsel and was cross-examined by counsel for the State.

It is not contended that the proceedings under which Freedman was found guilty were not conducted regularly and within the purview of the Act of Assembly. No such contention could have successfully been made in view of what this court held in *Ex Parte Bowles,* 164 Md. 318, 165 A. 169; *In re Lee,* 170 Md. 43, 183 A. 560; and *Hitzelberger v. State,* 173 Md. 435, 196 A. 288. But in support of his contention that the judgment appealed from should be reversed, appellant advances two propositions, viz: (1) That the letter under consideration is not *per se* contemptuous; (2) that even if this be not accepted, inasmuch as the contempt was constructive, his answer to the petition denying any improper or

ulterior motive in writing the letter had the effect of purging the contempt.

Respecting the second of these contentions, it is sufficient to state that the only legitimate effect of a denial of any improper purpose or motive is to mitigate the punishment, for, as was said by Judge Digges, speaking for this court, in the case of *Ex Parte Bowles, supra,* 164 Md. at page 333, 165 A. at page 175, concerning a constructive contempt: "In such cases one must be held to intend what he does, and the language indicating that intention be construed according to its usual ordinary import. It can never be that one could be guilty of acts which constitute contempt, and subsequently relieve himself by saying that, 'although it was contempt, I did not intend it.' The only legitimate effect of a subsequent denial of intention, if such denial be sincere and *bona fide,* is to mitigate the punishment. 6 *R.C.L.* 534; *Merrimack River Savings Bank v. Clay Center,* 219 U.S. 527, 31 S.Ct. 295, 55 L.Ed. 320; *In re Duncan,* 83 S.C. 186, 65 S.E. 210; *In re S,* 83 N.J. Eq. 607, 91 A. 801. In 13 *C.J.* 45, sec. 61, it is said: 'Disclaimer of intentional disrespect or design to embarrass the due administration of justice is no excuse, especially where the facts constituting the contempt are admitted or where the contempt is clearly apparent from the circumstances surrounding the commission of the act.'" See also *Hitzelberger v. State, supra,* and cases there cited; 12 *Am.Jur.,* page 439.

Upon those authorities, it must be held that if the letter written by appellant is by fair and ordinary import contemptuous, his answer denying an intention improperly to influence the court does not have the effect of purging the contempt.

This brings us to the principal question presented, which is whether the letter itself is contemptuous. The answer to that inquiry must depend, (1) upon a consideration of the essential elements of contempt, and (2) upon the usual and ordinary meaning of the language used by appellant in the letter.

"It is a grave contempt of court to communicate with or to seek in any way to influence a judge upon the subject of any matter, which he has to determine. * * * The contempt is the same whether the communication be accompanied by abuse or by bribe or not." *Oswald on Contempt,* (3rd Ed.), page 48.

In *Re Dyce Sombre* [1849], 1 Macn. & G. 116, 41 Eng. Reprint 1207, it was said by the lord chancellor: "Every private communication to a judge, for the purpose of influencing his decision upon a matter publicly before him, always is, and ought to be reprobated; it is a course calculated, if tolerated, to divert the course of justice, and is considered, and ought, more frequently than it is, to be treated as, what it really is, a high contempt of court * * * I have received * * * assurances that nothing disrespectful to myself was intended by that communication. I never considered it in that light; but as judge of the court against which contempt has been committed, I am bound to express my high reprobation of the course pursued." See, also, 12 *Am.Jur.,* page 389, sec. 2, and page 405, sec. 23; Annotation 31 *A.L.R.* 1239; *State v. Johnson,* 77 Ohio St. 461, 83 N.E. 702; *In re Parker,* (D.C.), 299 Fed. 1006.

Nothwithstanding appellant, in his answer, as well as in the testimony which he gave, disclaimed any intent to influence the decision of the judge in the Hennigan case, it seems to us that in view of the language used by him this could hardly be true. It could only be accepted as true by a very gullible person, for Freedman, who had lived in Baltimore four years and managed the Sun Cab Company, was an intelligent person with business experience. He not only by this communication gave the judge his personal opinion of Hennigan's good qualities from his close contact with Hennigan, but added that the latter had told him "exactly what had occurred, and in view of my past experience with him I believe what he told me to be true." Although at the hearing he testified he had formed no opinion as to Hennigan's guilt or innocence, because he did not know what Hennigan would

testify to at the trial, that explanation certainly does not square with his statement in the letter that Hennigan had informed him what occurred, and he believed he had told him the truth.

He further emphasized in the letter the high motives of his company in employing only men of excellent character, that they had not hesitated to discharge those who were otherwise, and would do the same in the present case, but it appeared from his testimony that Hennigan was still in the employ of his company. It is further shown that the Sun Cab Company at that time had an array of lawyers on its staff, yet it apparently never occurred to Freedman to give them the letter in order that they might present it to the judge at the hearing of the case, provided it were proper.

If the purpose of the letter was not to influence the court, why was it written? The answer, it seems to us, is inescapable, and must lie in the fact that Freedman, who preferred to keep his business engagements by attending the automobile sale, considered court procedure a secondary matter, and without consulting anyone, endeavored to reach the judge by this method. And it may be observed that the letter in question concerning Hennigan was based solely upon Freedman's personal observations and contact with him in a business way. He was, therefore, enabled to get before the court in this manner what he could not have testified to had he been called as a character witness. *Hochheimer's Criminal Law*, (2nd Ed.), sec. 175, page 198; 1 *Wigmore on Evidence*, sec. 691, 692; *Wigmore, Code of Evidence*, (2nd Ed.), secs. 228 and 1529; *Wigmore's Principles of Judical Proof*, pages 91, 92, 93.

It follows, from what has been said, that although a letter be neither abusive nor threatening, it may, when written to a judge concerning a case pending before him, be contemptuous if designed to influence him in the decision of the case.

Tested by the above rule, the conclusion is not only justifiable but compelling that the object of the letter

under consideration was to influence the court in its decision of the case. The communication was therefore contemptuous, and demonstrates the fallacy of approaching the judicial branch of our State, whose decisions, if justice is to be administered impartially, must suffer if such practices, so foreign to our fundamental concept of justice and right, are to be permitted, for, as previously observed, we are considering the conduct of a man whose business experience and civic responsibility should have warned him of the impropriety of the course he pursued. The court action therefore in finding him guilty of contempt is not, under the circumstances, erroneous.

There remains for consideration that part of the order appealed from relating to sentence. The statute under which the proceedings were had authorizes us to "consider and pass upon the law and the facts" and make "such order as * * * may seem proper, including the right to reverse or modify the order appealed from." It is urged by the State that inasmuch as the sentence was well within the power of the trial court, it should not be modified by this court, but that argument was equally applicable in the *Bowles* case, *supra*, yet a sentence of ninety days in jail was modified and in lieu there of a fine of $100 was imposed. Naturally, each case presents its own peculiar facts and circumstances, all of which are to be considered in approaching the matter of sentence.

From the questions propounded appellant by the trial court, we are convinced that the judge regarded his conduct much more distasteful and improper by reason of the fact that he had mailed the letter to the judge's home insead of sending it to the court house, the inference being that, had it been mailed to the latter address, it would have first been received by a bailiff, who might have consigned it to the waste basket, but that Freedman, desiring that the judge and no one else know of its contents, sent it to his home. The feeling was further shown by the opinion filed by the court, characterizing the act as "a piece of ill-considered, impertinent com-

mercialism * * * to communicate with a judge at his private home. * * *" Freedman, however, when questioned by the judge as to the purpose of sending the letter to his home, stated with apparent frankness that he had dictated the letter to his stenographer and left it to her to ascertain the address, and added that the only address of the judge which was listed was his home.

We confess our inability to view this incident in the light it was viewed by the trial court, for obviously it was Freedman's intention that the judge should receive the letter, and it seems quite unimportant, for the purpose of the case, whether he received it at his home or at some other address which was unlisted.

While courts should at all times deal firmly with all efforts from whatever source exerted to influence their impartial consideration of any case pending before them, it, by the same token, follows that the sentence meted out when guilt is established must not be of such character as to savor of oppression and vengeance under the guise of upholding judicial dignity.

In this case, in addition to a fine of $100, appellant was sentenced to imprisonment for three hours. Obviously, confinement in jail for so short a time would not have any corrective or disciplinary value, but could only tend to embarrass, humiliate, and degrade appellant. In view of a consideration of all the facts in the case, including the feature last referred to, a majority of this court agree that full and complete justice would be done, and at the same time the dignity of the trial court would be upheld and vindicated, by affirming the order appealed from in so far as it relates to a fine of $100 and costs, but reversing the order as to the three hours' imprisonment.

This conclusion necessitates a modification of the order appealed from to the extent thus indicated.

> *Order modified and case remanded for further proceedings not inconsistent with the views herein expressed, appellant to pay his costs above and below.*