GIANT OF MARYLAND, INC. *v.* STATE'S ATTORNEY
FOR PRINCE GEORGE'S COUNTY, MARYLAND

[No. 60, September Term, 1974.]

*Decided March 7, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Joseph D. Tydings*, with whom were *Aaron L. Handleman*,

*Robert D. Roadman* and *Danzansky, Dickey, Tydings, Quint & Gordon* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

We are here again confronted with a case arising from the legal skirmishing between the State's Attorney for Prince George's County in the fulfillment of his constitutional duties and the proprietor of a large supermarket alleged to have violated the "Sunday Blue Law" in effect for Prince George's County.[1] This is "round two" of the State's Attorney's pursuit of Giant of Maryland, Inc. (Giant) and comes as a sequel to *Giant of Maryland, Inc. v. State's Attorney for Prince George's County,* 267 Md. 501, 298 A. 2d 427, *appeal dismissed,* 412 U. S. 915 (1973). On Giant's first visit to this Court we sustained the constitutionality of Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 534H, found that Giant was not within the "small business" exemption provided in § 534H (c) 3, nor did it come within the exemptions provided for "drug stores," "delicatessens" or "bakeries and bake shops," within the meaning of § 534H (b). In vacating an order which enjoined Giant "from conducting business on Sunday with more than six employees at any given time in any one store in Prince George's County" we remanded the case for the entry of a decree enjoining Giant from violating the provisions of Art. 27, § 534H, and such a decree was entered on February 20, 1973.

On Sunday, December 16, 1973, Giant conducted an "Associates Day" in the department store portion of its large

---

1. *See* Hechinger Co. v. State's Attorney, 272 Md. 706, 326 A. 2d 742 (1974); State's Attorney v. Grand Union Co. & Safeway Stores, Inc., 267 Md. 501. 298 A. 2d 427 (1973); Rebe v. State's Attorney, 262 Md. 350, 277 A. 2d 616 (1971).

supermarket located in the Free State Mall in Bowie, Maryland, where it permitted its employees and members of their families to purchase merchandise at discount. The State's Attorney petitioned the court to hold Giant in contempt for violating the decree. After a hearing, the Chancellor (Taylor, J.) found that Giant had operated the department store "in their usual manner" and that the extension of shopping privileges to the families of Giant employees, including sisters-in-law, brothers-in-law and mothers-in-law, was tantamount to an operation of the establishment "for the general public." In its oral opinion the trial court stated:

> "I can appreciate that people working in commercial establishments such as Giant would seldom have an opportunity during Christmas and Easter seasons to shop with his or her family, but I do believe that there is a violation of the statute.
>
> They were doing business for labor or profit in the usual manner and location. The scale was not as great as that of other days and there were some areas of the store not operating, but certainly the department store was operating in 'their usual manner'; but it certainly does not seem to have been a flagrant violation of the statute. As a matter of fact, efforts were made to restrict participation in Associates Day to Giant employees or their families, and were it limited to Giant employees only I might be compelled to take a different view of the case.
>
> When the privilege to shop on Associates Day was extended to sisters-in-law, brothers-in-law, mothers-in-law, as testified by Mr. Sisson, then Giant offered to operate and operated its establishment for the general public."

From an adjudication that Giant was guilty of contempt and a fine of $100, an appeal was seasonably filed to the Court of Special Appeals. *See* Code (1974), Courts and Judicial Proceedings Article § 12-304. While the case was

pending in the Court of Special Appeals we issued a writ of certiorari to that court. *See* Code (1974), Courts and Judicial Proceedings Article § 12-203.

In its appeal Giant contends that the evidence offered in the trial court failed to establish that it conducted business on December 16, 1973, "in the usual manner," nor did it operate its establishment "in any manner for the general public," in violation of Art. 27, § 534H and that the evidence additionally failed to establish any intent on its part to violate the injunction.

In the trial court evidence was offered, in support of the petition for contempt, that an employee of Peebles Department Store, a competitor of the appellant in Bowie, at about 11 A.M. on December 16th was able to gain entrance to the store and made a single purchase of a pair of socks for seventy-nine cents. The witness acknowledged that two persons who had approached the entrance to the store in front of him were there confronted by a uniformed guard and upon acknowledgment that they were not employees of Giant were turned away by the guard, who told them that "this is for employees only shopping." Notwithstanding the witness's awareness of the restriction to employees for admission, he was able to evade the guard and gain entrance without being questioned.

A special investigator in the employ of the State's Attorney, upon the receipt of a complaint from an anonymous clergyman, visited the mall at about 2:50 P.M. that Sunday to verify the pastor's complaint. As he approached the entrance to the store from the mall he noticed six cashiers operating the cash registers. Entering, without confrontation — although he acknowledged that he was "well known" in the area — he sought out the store manager. During his visit to the premises — not lasting more than five minutes — and in a dialogue with the manager, he made inquiry concerning the manager's awareness of the existence of the injunction, obtained a roster of the employees there on duty and observed what appeared to him to be the conduct of business by the cashiers in a normal manner. Although the witness did not

recall seeing any posted signs restricting the patronage, he acknowledged that he was "not looking for any particular signs." The witness conceded that it was "possible" that the manager told him that "the store was open for employees only," and disclosed that he had also received a complaint that the store was open on Sunday, December 2nd, but did not pursue it because it was open "for employees only" on that date.

Uncontradicted testimony was offered by a vice-president and counsel for the appellant that beginning in 1964 Giant instituted an "Associates Day" in order to give its employees — both before Easter and before Christmas — an opportunity on a special day to do their holiday shopping with members of their families and to purchase, at discount, department store type goods sold by their employer. Employees of its various stores in the metropolitan area were given notice of such private shopping days by letters addressed to them, as well as by bulletins posted in the "employees only" area of the respective stores. When such an "Associates Day" was first scheduled in Prince George's County, after the opening of that store in the Free State Mall in 1968, the witness consulted the State's Attorney seeking assurance that such an operation would not be in violation of the statute. Although the State's Attorney advised him that "if it was an employees' or Associates Day, not open to the public that they would not take any action," he further advised that if complaints were received they would be required to "look into the situation with a closer analysis," and Giant would be advised of any such complaint. No complaint concerning the conduct of "Associates Day" was received from the State's Attorney in the intervening five year period. There was also testimony that the appellant regularly ran advertisements in the District of Columbia newspapers, soliciting the general public to purchase food and appliances on sale during the week and on which there was a legend announcing that the stores were "Open Monday through Friday from 9 A.M. to Midnight." The only announcement for Sunday, December 16th, was that promulgated directly to Giant employees.

The testimony of the general manager of the department store unit was similarly uncontradicted. Through his testimony it was elicited that Sunday, December 16th, was chosen — nine days before Christmas — to permit the employees and members of their families — which included "brothers, sisters, grandparents, brothers-in-law, sisters-in-law" [2] — to be able to shop at a discount in an atmosphere devoid of crowding by the general public; that on the date in question, to give notice to the public, printed posters stating: "SORRY! THIS IS A GIANT FAMILY PRIVATE PARTY. THANK YOU" were affixed on the only unlocked door into the mall in use that day, on both the right and left of the entrance to the store from the mall and on the exterior of an emergency exit facing High's Dairy Store, which is open on Sunday, to so inform the patrons of High's. Special guards were stationed at the entrance to the store and at the "customer pickup" area in the rear, to turn away any members of the general public seeking to enter. Just for the occasion Giant hired a costumed Santa Claus with whom the invitees might have their photograph taken; a portable television set was awarded an employee as a result of a drawing held for those in attendance.

Both the manager and assistant manager served that Sunday without compensation; their duties were "to socialize" with the employees, many of whom, personally known to the general manager, were greeted at the door; many who shopped were recognized by him. In addition to the special guards, he turned away members of the general public undertaking to enter the store by advising them that a "private party" was in progress and asked them to "please come back on Monday."

The general manager was explicit in his testimony that in his dialogue with the State's Attorney's investigator he told him he was familiar with the statute and advised him that "this is a private party for Giant associates only."

2. Judge Taylor's inclusion of "mothers-in-law" within the class seems to be inaccurate. As Erle Stanley Gardner said in Some Women Won't Wait: "Two classes of people have poor public relations — mothers-in-law and attorneys-at-law."

By way of comparison with the usual conduct of business the general manager explained that on a normal business day the department store sector is manned by a staff of approximately 170 employees, whereas, on the date in question, 42 employees were assigned to duty during the interval the department was open, with no more than 30 employees at any one time actually working. On the date in question 687 transactions were reflected through the cash registers, whereas, on the preceding Saturday over 4,000 such transactions were recorded, and that the total sales on that Sunday were computed to amount to approximately twenty-five percent of the usual Saturday receipts. Although the supermarket from Monday through Saturday is open from 9 A.M. until midnight, the limited hours for "Associates Day" were 10 A.M. to 6 P.M. Testimony was further elicited that the food center portion of the store, usually also open during the business week, was closed; that no merchandise was received at the premises, nor were any items stocked upon the shelves, as customarily occurs from Monday through Saturday. In possible explanation of the ability of the witness to have made a seventy-nine cent purchase without his identity being learned by the cashier who "rung up" his sale, the manager testified that for the purchasers to avail themselves of the ten percent discount it was necessary to fill out a card listing name, address, Social Security number and place of employment, which was then "validated" and ten percent deducted from the total sale; that the discount was not offered to persons making a purchase of less than two dollars unless it was specifically requested, and in such an event the employee was required to specifically request the form from the cashier and complete it.[3]

The pertinent portion of Art. 27, § 534H here in issue reads as follows:

---

[3] There is no testimony that the employee of the competitor, who purchased the socks, was even aware that the store patrons on that Sunday were entitled to a ten percent discount.

"(a) In Prince George's County, except as specifically in this section otherwise provided, it is unlawful on Sunday for any wholesale or retail establishment to conduct business for labor or profit *in the usual manner and location or* to operate its establishment *in any manner for the general public.* It shall not cause, direct, permit, or authorize any employee or agent to engage in or conduct business on its behalf on Sunday." (Emphasis supplied.)

In addition to the right of the State's Attorney to petition for injunctive relief, as provided in subsection (i), subsection (j) makes any violation of the section a misdemeanor subject to punishment by a fine not exceeding $1,000 "for each employee caused, directed, permitted or authorized to work" in violation of the section.

In construing § 534H Chief Judge Murphy, for the Court, in *Giant of Maryland, Inc. v. State's Attorney for Prince George's County, supra,* stated:

"We must, of course, construe the statute according to the ordinary and natural import of its language; it is the language used in the statute which constitutes the primary source for determining the legislative intent. *Atlantic, Gulf v. Dep't of Assess. & T.,* 252 Md. 173, 249 A. 2d 180 (1969); *Maryland Medical Service v. Carver,* 238 Md. 466, 209 A. 2d 582 (1965); *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961). Consequently, we cannot disregard the natural import of statutory language unless some imperative reason is found in the statute for enlarging or restricting its meaning. *Hunt v. Montgomery County,* 248 Md. 403, 237 A. 2d 35 (1968); *Celanese Corporation v. Davis,* 186 Md. 463, 47 A. 2d 379 (1946). We thus confine ourselves to the construction of the language of § 534H as written and we will not supply omissions or insert exemptions not made by the Legislature. *Birmingham v. Board of Public Works,* 249 Md. 443,

239 A. 2d 923 (1968); *Amalgamated Ins. v. Helms*, 239 Md. 529, 212 A. 2d 311 (1965). In other words, where statutory language is plain and free from ambiguity, and expresses a definite and sensible meaning, courts are not at liberty to insert or delete words with a view toward making the statute express an intention which is different from its plain meaning. *Gatewood v. State*, 244 Md. 609, 224 A. 2d 677 (1966); *Fowel v. State*, 206 Md. 101, 110 A. 2d 524 (1955); *Pressman v. State Tax Commission*, 204 Md. 78, 102 A. 2d 821 (1954)." 267 Md. at 511-12, 298 A. 2d at 433.

"Usual" is defined in Webster's New International Dictionary of the English Language, at 2807 (2d ed. 1944) as "[s]uch as in common use; such as occurs in ordinary practice, or in the ordinary course of events; customary; ordinary; habitual, common. . . ."

As we read the first sentence in Art. 27, § 534H (a), the Legislature intended to prohibit, in Prince George's County, on Sundays, the conduct of business, by labor or profit, of any wholesale or retail establishment at the location and in the manner in which it was customarily, normally and commonly conducted on days other than Sunday, and proscribed as well its operation in any manner on a Sunday by which it was available for patronage by the public at large.

Nor do we read the second sentence in the section as prohibiting separate and distinct conduct from that proscribed in the first sentence, since when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. *See Culotta v. Raimondi*, 251 Md. 384, 387, 247 A. 2d 519, 521 (1968); *State Ins. Comm'r v. Nationwide Mut. Ins. Co.*, 241 Md. 108, 115, 215 A. 2d 749, 753 (1966); *Smith v. Higinbothom*, 187 Md. 115, 130, 48 A. 2d 754, 761-62 (1946). This rule is applied more strictly in the construction of penal

statutes — as is Art. 27, § 534H — since penal statutes shall be narrowly construed. *Smith v. Higinbothom, supra; State v. Fleming*, 173 Md. 192, 196, 195 A. 392, 393 (1937). As we read it, the second sentence relates to and qualifies the conduct proscribed in the first sentence and cannot be construed as extending or including other conduct. *See Webb v. City of Baltimore*, 179 Md. 407, 409, 19 A. 2d 704, 705 (1941); *Continental Oil Co. v. Horsey*, 175 Md. 609, 612-13, 3 A. 2d 476, 477-78 (1939). *See also Larkins v. State*, 163 Md. 372, 376-77, 163 A. 195, 197 (1932). *Compare, Blake v. State*, 210 Md. 459, 462-63, 124 A. 2d 273, 274 (1956).

As we interpret it, the second sentence is a corollary to the penalty provision set forth in subsection (j) of the statute and is intended to mean that no wholesale or retail establishment shall cause, direct or permit [its] employee or agent to engage in or conduct business on its behalf on Sunday — "in the usual manner and location" or "in any manner for the general public."

In *State v. Roll*, 267 Md. 714, 298 A. 2d 867 (1973), Judge Digges, for the Court, in pointing out the distinction between civil and criminal contempts, stated:

> "[I]n this State, the distinction between the two types of contempt has been preserved and is important. A civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally remedial in nature and are intended to coerce future compliance. Thus, a penalty in a civil contempt must provide for purging. On the other hand, the penalty imposed in a criminal contempt is punishment for past misconduct which may not necessarily be capable of remedy. Therefore, such a penalty does not require a purging provision but may be purely punitive. In this State, to these factors must be added the degree of proof required to establish a contempt — a civil contempt need be proved only by a preponderance of the evidence, while a

criminal contempt must be shown beyond a reasonable doubt. *Winter v. Crowley,* 245 Md. 313, 226 A. 2d 304 (1967); *Donner v. Calvert Distillers Corp.,* 196 Md. 475, 77 A. 2d 305 (1950)." 267 Md. at 728, 298 A. 2d at 876.

Judge Barnes, who delivered the opinion for this Court in *Winter v. Crowley,* 245 Md. 313, 226 A. 2d 304 (1967), delineated the five factors which generally point to a civil contempt as:

"(1) the complainant is usually a private person as opposed to the State; (2) the contempt proceeding is entitled in the original action and filed as a continuation thereof as opposed to a separate and independent action; (3) holding the defendant in contempt affords relief to a private party; (4) the relief requested is primarily for the benefit of the complainant; (5) the acts complained of do not of themselves constitute crimes or conduct by the defendant so wilful or contumelious that the court is impelled to act on its own motion. . . ." 245 Md. at 317, 226 A. 2d at 307.

Pursuant to Maryland Rule P4 the State's Attorney instituted the proceedings against Giant to have it adjudged guilty of violating the injunction entered on February 20, 1973, and for a punitive punishment. *See* Maryland Rule BB80 a. The proceedings were thus for an adjudication of constructive criminal contempt, and required a proof beyond a reasonable doubt. The Appellee so concedes.

This Court, in *Ex Parte Bowles,* 164 Md. 318, 165 A. 169 (1933), held that one who has been shown guilty of contempt cannot relieve himself from liability therefor by denying an intention to commit contempt. Bowles, the plaintiff in a slander suit, filed a motion for its removal or for the disqualification of the trial judge, asserting in an accompanying affidavit that the judge's son was opposing counsel, that the defendant was the father-in-law of the judge's son, that the judge had aided the son "in contesting

the plaintiff's right to intervene [in the case]" and that it was his belief, confirmed by many members of the local Bar, that he could not receive "a fair and impartial trial in any matter in which" the judge's son and the son's father-in-law were involved before the trial judge. When the matter was heard, before another judge in the Circuit, upon a citation for contempt of court, Bowles, by answer and in testimony, disclaimed any contemptuous intent.

Without discussing whether the nature of the contempt was direct or constructive, civil or criminal, our predecessors, speaking through Judge W. Mitchell Digges, stated:

> "The appellant contends that he had no intention of committing contempt, and that his denial of that intention in the answer frees him from the responsibility for his act. In such cases one must be held to intend what he does, and the language indicating that intention be construed according to its usual ordinary import. It can never be that one could be guilty of acts which constitute contempt, and subsequently relieve himself by saying that, 'although it was contempt, I did not intend it.' The only legitimate effect of a subsequent denial of intention, if such denial be sincere and *bona fide*, is to mitigate the punishment." (Citations omitted.) 164 Md. at 333, 165 A. at 175.

*See Freedman v. State*, 176 Md. 511, 515, 6 A. 2d 249, 251 (1939), quoting from *Ex Parte Bowles*, *supra*, but holding that denying an intention improperly to influence the court [by a letter written about a pending case] does not have the effect of purging the contempt if the letter, on its face, by fair and ordinary import, is contemptuous.

*Donner v. Calvert Distillers Corp.*, 196 Md. 475, 77 A. 2d 305 (1950), involved an appeal by two brothers who operated a cut rate liquor store from an adjudication of criminal contempt for violating the terms of a decree which enjoined them from selling the products of Calvert Distillers at prices lower than those established under the Fair Trade Act. The

evidence disclosed that Joseph Donner had on two occasions sold "Calvert Reserve" for $3.95 per fifth, including sales tax, although the minimum price list supplied by the appellees stated that the prices listed were exclusive of taxes.

Although the Court in its opinion did not discuss the element of intent, indirectly it seemed to apply a need for its existence for it was concluded that: "[u]nder these circumstances, since Joseph Donner sold only at the price listed including the tax, and since this is a semi-criminal proceeding, we are unwilling to hold him guilty." 196 Md. at 493, 77 A. 2d at 313.

Again, in *Sheets v. City of Hagerstown,* 204 Md. 113, 102 A. 2d 734 (1954), the Court, although refusing to label the contempt of which Sheets was found guilty as either civil or criminal, found the existence of intent. Sheets had been enjoined from constructing and operating a parking lot in an area zoned against such use. Thereafter Sheets obtained a permit to erect an office and service building with a driveway upon the property where he had originally contemplated a parking lot. The driveway was across the street from an A & P supermarket and was being extensively used by its employees and patrons for parking. Cited for contempt for violating the injunction, Sheets undertook to show that the supermarket patrons who used the lot were trespassers, that the lot was indeed only a "driveway" for which he had a permit and that signs conspicuously posted described it as being for the use of tenants. Finding that this was a "smoke screen" for Sheets' purpose of maintaining a parking lot despite the injunction, his conviction was sustained.

Although the lower court had treated the contempt proceedings to be civil in nature, our predecessors "deem[ed] it unnecessary to label the contempt of which Sheets was found guilty, because we think that the evidence before the lower court was clear, convincing and satisfying beyond doubt that he used and maintained the lot as a parking area in *deliberate* and *intentional* defiance of the court's injunction not to do so." (Emphasis supplied.) 204 Md. at

120, 102 A. 2d at 736. *See also Kelly v. Montebello Park Co.*, 141 Md. 194, 206, 118 A. 600, 604 (1922), where, even though the appeal was dismissed, the Court noted that the appellants' had "wilfully violated" a decree enjoining them from erecting a garage on their lot.

Chief Judge Murphy (then Chief Judge of the Court of Special Appeals), for that Court, in *Goldsborough v. State*, 12 Md. App. 346, 278 A. 2d 623 (1971), although recognizing the holdings in *Ex Parte Bowles*, *supra*, pointed out that where the act is not plainly contemptuous on its face a claim of good faith has been found determinative in some cases. He stated:

> "[I]f his remark was made under an honestly entertained, though mistaken, view of the law, the fact alone that it may have tended to prejudice the State's case would not, without more, constitute contempt. *See United States v. Sopher*, 347 F. 2d 415 (7th Cir.); *Steinberg v. United States*, 162 F. 2d 120 (5th Cir.); *Sprinkle v. Davis*, 111 F. 2d 925 (4th Cir.). While it is never a complete defense to a charge of contemptuous conduct that no such conduct was intended, *Ex Parte Bowles*, *supra*, at pp. 332-333, where the act comprising the alleged contempt is not plainly contemptuous on its face, a claim of good faith has been held entitled to serious consideration and has been found determinative in some cases. *See May Hosiery Mills v. United States District Court*, 64 F. 2d 450 (9th Cir.); *Caldwell v. United States*, 28 F. 2d 684 (9th Cir.); *Sprinkle v. Davis*, *supra*; 17 C.J.S. *Contempt*, p. 20." 12 Md. App. at 357, 278 A. 2d at 629.

In *Goldsborough*, an attorney had been summarily found guilty of a direct criminal contempt as a result of an opening statement in which he made reference to an earlier acquittal of a codefendant. The trial court had mandated the exclusion of those jurors who had sat on the earlier case.

After noting that Goldsborough intentionally made the remark, but believed that it was "proper argument," and

noting that it was "uncertain as to the extent that he [the trial judge] intended to base his contempt finding on the violation of his order or mandate," the court stated, in remanding the case:

"[W]e are uncertain whether the trial judge considered the crucial element of whether Goldsborough intentionally and with calculated prejudicial purpose, made the improper argument, knowing that it was improper, or not caring whether it was or not. Under these circumstances, we deem it expedient to remand the case for further consideration by the trial judge in light of the principles developed in this opinion." 12 Md. App. at 358-59, 278 A. 2d at 630.

In *In re Kinlein*, 15 Md. App. 625, 292 A. 2d 749 (1972), the Circuit Court for Howard County, prior to the scheduled trial of a celebrated arson case, issued an order prohibiting counsel in the case from making any extrajudicial statements which were, or tended to be, prejudicial to a fair trial. Thereafter the State's Attorney for Howard County made statements quoted in the press that the arson charges drawn by the State's Attorney for Dorchester County were fabricated, that the charge of inciting to riot was part of the "phony indictment," which was in material part false and that he would rather be defending the case than prosecuting it. The two-judge court in adjudging Kinlein guilty of criminal contempt found " 'beyond a reasonable doubt, and to a moral certainty, that the words that were uttered, by their common meaning, inherently and *on their face*, * * * at least tend to prejudice a fair trial in this case.' " (Emphasis supplied.)

Kinlein, not disputing the making of the statements ascribed to him, nor his knowledge of the order he was found to have violated, argued that the evidence was deficient because it did not establish an intention on his part to prejudice a fair trial. The Court of Special Appeals, in an opinion by Judge Orth (now Chief Judge of that court), concerning the issue of intent, stated:

"We see no merit whatsoever in the claim that the judgment must be reversed because 'the element of willfulness was neither alleged nor proved beyond a reasonable doubt.' Kinlein argues that the evidence had to show that he willfully attempted to prejudice a fair trial. But all that was required here was that the statements which had a reasonable likelihood of preventing a fair trial were willfully made in violation of the court's order. And this Kinlein does not dispute. Lack of intent to prejudice the fairness of the trial may go to mitigation of punishment but not to the commission of the act of contempt. See *Ex Parte Bowles,* 164 Md. 318. Good faith is not determinative where, as here, the *act comprising the alleged contempt is plainly contemptuous on its face. Goldsborough v. State,* 12 Md. App. 346." (Emphasis supplied.) 15 Md. App. at 641, 292 A. 2d at 759.

The conviction of an attorney for contempt of court where he failed to appear on the date set for trial was set aside in *Sykes v. United States,* 444 F. 2d 928 (D.C. Cir. 1971), for want of evidence of intent. The evidence established that the failure of the appellant to appear "was not by design but resulted from a lapse of memory, preoccupation with another case and confusion as to dates"; he had failed to look at his day book and was under an honest impression that he was not scheduled to appear until the following week since he had an appellate case to argue on the same date.

In a per curiam that Court stated:

"[T]he offense of which the appellant was convicted was a criminal contempt. An essential element of that offense is an intent, either specific or general, to commit it. Wilson v. North Carolina, 169 U.S. 586, 600, 18 S.Ct. 435, 42 L.Ed. 865 (1898); United States ex rel. Porter v. Kroger Grocery & Baking Co., 163 F.2d 168 (7th Cir. 1947); People v. Rice, 96 Ill.App.2d 253, 238 N.E.2d 266 (1968). By definition,

contempt is a *'wilful* disregard or disobedience of a public authority'. (Emphasis supplied) Bouvier's Law Dictionary (3d revision 1914); Black's Law Dictionary (revised 4th ed. 1968). The requisite intent may of course be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty. In the appellant's case, however, there was no evidence that he deliberately or recklessly disregarded his obligation to the court, or that he intended any disrespect for the court." 444 F. 2d at 930.

*In accord* is *In re Brown,* 454 F. 2d 999 (D.C. Cir. 1971), where an attorney, who was not a member of the Bar of the United States District Court, was adjudged guilty of contempt in filing a motion on behalf of an indigent defendant seeking release pending appeal. The attorney, in response to a letter of inquiry from the clerk of the court, expressed a willingness to represent indigent defendants, pointed out his membership in the Bar of other jurisdictions, but advised that he was not a member of the Bar of the District Court. An employee of the clerk's office failed to note this disqualification and the attorney was appointed to represent the indigent defendant. The United States Court of Appeals, in setting aside his conviction for contempt for want of evidence of "contumacious intent," stated:

"[A] degree of intentional wrongdoing is an ingredient of the offense of criminal contempt. [Footnote omitted]. Only recently we pointed out that '[a]n essential element of that offense is an intent, either specific or general, to commit it. . . . By definition, contempt is a *"wilful* disregard or disobedience of a public authority." ' 38 [n.38 cites: "Sykes v. United States, 144 U.S.App.D.C. 53, 55, 444 F.2d 928, 930 (1971)."] Knowledge that one's act is wrongful and a purpose to nevertheless do the act are prerequisites to criminal contempt, as to most other crimes. 39 [n.39 cites: "United States v. UMW, 330 U.S. 258, 303, 304, 67 S.Ct. 677, 91 L.Ed.

884 (1947); United States v. Jackson, 426 F.2d 305, 308-309 (5th Cir. 1970); In re Marshall, 423 F.2d 1130, 1131-1132 (5th Cir. 1970); United States v. Sopher, *supra* note 30, 347 F.2d at 418; In re D. I. Operating Co., 240 F.Supp. 672, 676 (D.Nev. 1965). See also Wilson v. North Carolina, 169 U.S. 586, 600, 18 S.Ct. 435, 42 L.Ed. 865 (1898); Offutt v. United States, 98 U.S.App.D.C. 69, 72, 232 F.2d 69, 72, cert. denied, 351 U.S. 988, 76 S.Ct. 1049, 100 L.Ed. 786 (1956)."] Good faith pursuit of a plausible though mistaken alternative is antithetical to contumacious intent, 40 [n.40 cites: "See Nilva v. United States, 352 U.S. 385, 395, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); United States ex rel. Shell Oil Co. v. Barco Corp., 430 F.2d 998, 1002 (8th Cir. 1970)."] however unimportant it may be in the context of civil contempt. [Footnote omitted]. And proof beyond a reasonable doubt that the alleged contemnor possessed the required intent must forerun a criminal contempt conviction." [Footnote omitted]. 454 F. 2d at 1006-07.

In *United States v. Sopher,* 347 F. 2d 415 (7th Cir. 1965); *Steinberg v. United States,* 162 F. 2d 120 (5th Cir. 1947); *Sprinkle v. Davis,* 111 F. 2d 925 (4th Cir. 1940); *May Hosiery Mills v. United States District Court,* 64 F. 2d 450 (9th Cir. 1933); and *Caldwell v. United States,* 28 F. 2d 684 (9th Cir. 1928), all cited in *Goldsborough v. State, supra,* as well as in *People v. Rice,* 96 Ill. App. 2d 253, 238 N.E.2d 266 (1968), none of the conduct charged as the basis for contempt was shown to have been contemptuous on its face and in each instance the lack of such contumacious intent was found to be exculpatory.

A distillation of the holdings in all these cases leads us to the conclusion that when the contempt is charged as criminal in nature, and the conduct is not shown to be plainly contemptuous on its face, proof beyond a reasonable doubt that the alleged contemnor possessed a contumacious intent is a necessary ingredient for an adjudication of guilt.

*See* 17 Am.Jur.2d *Contempt* § 8 (1964); 17 C.J.S. *Contempt* § 8 (c), § 12 (1963). We think such conclusion is buttressed when, as under facts like those here, the conduct alleged to be contemptuous at the same time would constitute a misdemeanor in violation of Art 27, § 534H (j), and the penalty therein provided. *See Hitzelberger v. State,* 173 Md. 435, 444, 196 A. 288, 292 (1938).

We think the holdings in *United States ex rel. Porter v. Kroger Grocery & Baking Co.,* 163 F. 2d 168 (7th Cir. 1947), are here particularly apposite. *Kroger,* by making sales of meat at a number of stores in the Chicago area in excess of the ceiling price, was adjudged in contempt of court for violating an injunction which restrained it from selling or offering to sell at prices in excess of the maximum prices established by OPA regulations. *Kroger,* by answer and at trial, did not dispute that the alleged sales had been made, but contended that they "did not intend to defy the authority of the court and did not intentionally commit the acts relied upon to prove such defiance of the injunction," and that such sales were attributable to conditions encountered in the sale of meat and meat products, as well as unintentional errors by those employees who were charged with the responsibility of determining and affixing the maximum ceiling prices. In reversing the conviction the court pointed out that the uncontradicted proof offered by *Kroger* showed, or tended to show, the good faith effort which it made to comply with the ceiling price regulations, as well as the injunction, in that store managers and meat cutters had been informed of the injunction, bulletins were from time to time issued urging employees to comply with the ceiling prices, and that it had used a shopping service to "shop" its stores to see if its instructions were being followed by its personnel. Noting that the principal issue was whether a denial of intent to commit contempt is a defense and that the injunction "did not enjoin the making of sales but was only directed at sales made in a certain manner, that is, at a price above the ceiling," the court stated:

"In Wilson v. State of North Carolina, 169 U.S.

586, 600, 18 S.Ct. 435, 42 L.Ed. 865, the court in a contempt proceeding ordered the rule discharged because the evidence failed to disclose an intentional contempt on the part of the relator. In In re Rice, C.C., 181 F. 217, 228, the court discharged a defendant charged with contempt of a court order and in doing so stated: 'No one can be punished for a criminal contempt unless the evidence makes it clear that he intended to commit it. To [the] doubt is to be resolved in favor of respondent.' " 163 F. 2d at 173.

After concluding that: "We are of the view that the intent with which the overcharges were made is an essential element of the contempt charged and that the burden was upon the plaintiff to establish such element beyond all reasonable doubt," the court found that there was no substantial evidence to support the finding that Kroger's conduct had been deliberate, knowing and willful.

In opposition to the testimony of the State's Attorney's investigator concerning what appeared to him to be the conduct of business "in a normal manner," the evidence presented by Giant's witnesses was massive and uncontradicted as to the differences between how Giant conducted its supermarket for "Associates Day" on Sunday, December 16, 1973, in contrast with the manner in which it customarily, normally and commonly conducted its business at the same location on days other than Sunday.

The fact that that portion of the store devoted to the sale of foods was closed, that announcements of the opening were limited to letters and bulletins promulgated to the employees, that the premises were open from 10 A.M. to 6 P.M., and only for Giant employees and members of their immediate families, the limited number of personnel on duty, the volunteered services of the manager and assistant manager, the employment of a costumed Santa Claus and a drawing giving away a portable television set, all compel the conclusion that the appellant was not conducting business "in the usual manner and location" as proscribed by the statute when it held "Associates Day" on December 16, 1973.

Nor does the surreptitious entry by the employee of a competitor, who purchased a pair of socks without identification give rise to even an inference of evidence that the appellant "operated its establishment in any manner for the general public," equally prohibited by the statute, in view of the uncontradicted evidence concerning the signs affixed, as well as the guards posted at the entrances to turn away members of the general public and the admitted evidence that such patrons were denied entry. We think the finding by the Chancellor was overstrained when he found that the privilege extended to "sisters-in-law, brothers-in-law and mothers-in-law" constituted an operation "for the general public."

As pointed out in *Kroger, supra*, the appellant was not under an injunction prohibiting it from operating its store on Sunday for a private sale for its employees and members of their families — the injunction was "from *violating* the provisions of Art. 27, § 534H."

These reasons alone compel a reversal, without a new trial, of the finding that the appellant violated the terms of the injunction.

Finding as we do, that the conduct of the appellant was not contemptuous on its face, we further conclude that proof of its contumacious intent, beyond a reasonable doubt, was a necessary ingredient to sustain the offense charged, since an adjudication of its guilt for criminal contempt was tantamount to a finding of its guilt of a misdemeanor under § 534H (j).

Although "the fact that failure to comply with the judicial command was based on the advice of counsel is generally held to be no justification," *Weaver v. State*, 244 Md. 640, 644, 224 A. 2d 684, 687 (1966), *Tyler v. Baltimore County*, 256 Md. 64, 67, 259 A. 2d 307, 309 (1969), and although advice given by a State's Attorney that a contemplated act would not be criminal has been held not to excuse an offender if, as a matter of law, the act performed would amount to a violation of the law, *Hopkins v. State*, 193 Md. 489, 498, 69 A. 2d 456, 460, *appeal dismissed*, 339 U. S. 940 (1950), we think that the consultation by the vice-president and counsel for

Giant in 1968, before it commenced holding "Associates Day" at its store in the Free State Mall, while not constituting a defense to a charge for criminal contempt, was evidence of a lack of contumacious intent on its part to violate the provisions of Art. 27, § 534H, when it thereafter periodically conducted "Associates Day" including the one held on Sunday, December 16, 1973.

When the Chancellor stated that he "might be compelled to take a different view of the case" if "efforts were [had been] made to restrict participation in Associates Day to Giant employees or their families," we think he overlooked the uncontradicted evidence concerning the genuine and bona fide efforts made by Giant through its personnel to exclude members of the general public and to restrict participation in "Associates Day" — as it did — to its employees and a limited class of their relatives.

Upon our review of both the facts and the law we additionally find that no evidence was offered from which it could be found that the appellant possessed the requisite intent to violate the injunctive decree of February 20, 1973.

We conclude, upon the uncontradicted evidence offered in the trial court that its decision was clearly erroneous and the judgment imposed must be set aside. Maryland Rule 886; *Donner v. Calvert Distillers Corp., supra; In re Lee,* 170 Md. 43, 61, 183 A. 560, 568, *cert. denied* 298 U. S. 680 (1936).

> *Judgment of the Circuit Court for Prince George's County reversed; case remanded, without a new trial, for the entry of a verdict of "not guilty"; costs to be paid by Prince George's County, Maryland.*